*Bridget Romeka v. RadAmerica II, LLC, et al.*, No. 16, September Term, 2022.  Opinion by Gould, J.

**HEALTH CARE WORKER WHISTLEBLOWER PROTECTION ACT – CAUSATION**

The Supreme Court of Maryland held that to prevail under the Health Care Worker Whistleblower Protection Act, a plaintiff (1) must prove that but for the protected disclosure, the employer would not have taken the adverse personnel action, and (2) may establish but-for causation through the analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**HEALTH CARE WORKER WHISTLEBLOWER PROTECTION ACT – SUMMARY JUDGMENT**

The Supreme Court of Maryland held that, in a claim of retaliatory firing under the Health Care Worker Whistleblower Protection Act, where a defendant establishes, through a motion for summary judgment filed pursuant to Maryland Rule 2-501 and supported by an affidavit or facts in the record, that there is no genuine dispute as to any material fact that a plaintiff was fired for reasons unrelated to an alleged protected disclosure and plaintiff fails to respond with an affidavit or written statement under oath or to identify any information in the record that establishes a genuine dispute of material fact as to whether defendant's stated reasons for the termination were pretextual, summary judgment is properly granted in defendant's favor.

Circuit Court for Baltimore City
Case No.: 24-C-19-002767
Argued: January 6, 2023

IN THE SUPREME COURT

OF MARYLAND*

No. 16

September Term, 2022

_____

BRIDGET ROMEKA

v.

RADAMERICA II, LLC, et al.

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Gould,
Eaves,
McDonald, Robert N. (Senior Judge,
          Specially Assigned),


JJ.

_____

Opinion by Gould, J.

_____

Filed: August 30, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

This case arises from the termination of employment of petitioner Bridget Romeka by respondents RadAmerica II, LLC ("RadAmerica"), MedStar Health, Inc. ("MedStar"), and Helixcare Medical Group, LLC ("Helixcare," and together with RadAmerica and MedStar, "Employer").  Ms. Romeka alleged that her termination violated the Maryland Health Care Worker Whistleblower Protection Act (the "HCWWPA" or the "Act"), Md. Code Ann., Health Occ. ("HO") §§ 1-501 through 1-506 (1981, 2021 Repl. Vol.), a statutory scheme that protects employees in healthcare settings against adverse employment consequences from raising health and safety concerns in the workplace.

The circuit court granted Employer's motion for summary judgment, finding that the undisputed facts established that Employer terminated Ms. Romeka on other, non-pretextual grounds.  The Appellate Court of Maryland[1] affirmed in a reported decision. *Romeka v. RadAmerica II, LLC*, 254 Md. App. 414 (2022).

We granted Ms. Romeka's petition for a writ of certiorari.  *Romeka v. RadAmerica II, LLC*, 481 Md. 1 (2022).  Ms. Romeka presents two questions for our review:

1. Did the lower court err by requiring a plaintiff with a retaliation claim under the HCWWPA to show that protected conduct was the but-for cause of the challenged personnel action?

2. Did the lower courts err in awarding summary judgment to the employer, despite genuine disputes of material fact, on the ground that Ms. Romeka could not establish her retaliation claim as a matter of law?

---

[1] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland, and the name of the Court of Appeals to the Supreme Court of Maryland.  The name changes took effect on December 14, 2022.

We answer both questions in the negative and affirm the judgment of the Appellate Court.

## FACTUAL AND PROCEDURAL BACKGROUND

RadAmerica is a wholly owned subsidiary of MedStar. RadAmerica contracted with Mercy Medical Center, Inc. ("Mercy"), to supply Mercy with medical physicists and radiation therapists for its Radiation Oncology Center (the "ROC"). In the ROC, RadAmerica employees worked with Mercy's physicians and employees. In 2001, RadAmerica hired Ms. Romeka as a radiation therapist and promoted her to Chief Radiation Therapist in October 2003.[2] As Chief Radiation Therapist, she supervised three radiation therapists at the ROC: Scott Blackburn, Fabjola Cangonji, and Heather Gilliam.

Ms. Romeka's direct supervisor was Christopher Osik, the Technical Director of RadAmerica who oversaw radiation therapy services at the ROC and six other offices. Mr. Osik's manager was Dr. Coleman Rosen, RadAmerica's Vice President of Technology Management. Dr. Fritz Lerma was RadAmerica's Chief Medical Physicist for the ROC. He was responsible for maintaining the calibration of the equipment in the ROC for stereotactic radiosurgery ("SRS") treatments.

Dr. Maria Jacobs was the medical director of the radiation oncology unit at Mercy. Dr. Jacobs planned and oversaw all radiation therapy treatments administered at the ROC and, in that capacity, worked with Ms. Romeka.

---

[2] Ms. Romeka stated that she was promoted in 2003; RadAmerica stated that she was promoted in 2002. This factual dispute is not material to the motion for summary judgment.

2

Radiation treatment was delivered at the ROC by a machine manufactured by Varian, Inc. ("Varian"), called the TrueBeam. The TrueBeam was used to provide SRS treatments to patients with cancer in the head, neck, lung, breast, prostate, and liver. The TrueBeam had three essential parts: (1) the linear accelerator; (2) the imaging system; and (3) the treatment couch.

Before treating a patient, the radiation therapist was required to make sure the necessary documents were in the patient's chart, which was kept in an electronic medical record ("EMR"). Such documents included a written consent form signed by the patient, a physician, and a witness. The radiation therapist was not permitted to deliver radiation treatment to the patient without a completed and scanned consent form.

### Initial Investigations

On May 2, 2018, after learning of two problems related to Ms. Romeka's job performance, Dr. Rosen and Mr. Osik began investigating Ms. Romeka's conduct. The first problem came to light when, in April 2018, a routine peer review of randomly selected EMRs of ROC patients revealed that a patient had received treatment even though the EMR file lacked a completed and signed consent form. Ms. Romeka had administered the treatment in that case. After she was confronted about the missing document, she accessed the patient's EMR, and, without consulting anyone, falsely marked "Y" (Yes) in the patient's first weekly chart check, indicating that the consent form had been signed and scanned into the EMR before treatment began. She also backdated the patient's first weekly chart assessment and marked it as complete.

3

Shortly after she accessed the patient's EMR, Ms. Romeka notified Dr. Jacobs that she had administered treatment to a patient without the requisite consent form in the patient's EMR. When Mr. Osik later learned of this, he requested that Ms. Romeka submit a report in MedStar's patient safety event system, which Ms. Romeka did. No consent form was ever found.

The second problem arose from a complaint from a radiation therapist on Ms. Romeka's team, Mr. Blackburn. On May 1, Mr. Blackburn complained to Mr. Osik about Ms. Romeka's treatment of him and the rest of the team. According to Mr. Blackburn, Ms. Romeka was bullying the radiation therapists, failing to train them, and blaming her mistakes on other people. He also claimed that she did not understand the "basic concepts of radiation treatment" and was disrespectful to the ROC medical staff. Mr. Blackburn said that all three radiation therapists under Ms. Romeka's supervision were prepared to resign unless she was removed as their supervisor.

On May 2, Dr. Rosen and Mr. Osik interviewed the two other radiation therapists as well as Dr. Jacobs, Dr. Lerma, and Ms. Romeka. According to Dr. Rosen's notes, the two other radiation therapists confirmed that they were "willing to resign rather than put up with [Ms. Romeka] any longer." Other co-workers gave similar criticisms of Ms. Romeka's conduct to Dr. Rosen and Mr. Osik.

Dr. Jacobs also complained to Mr. Osik about Ms. Romeka's job performance, describing her work as sloppy and rushed. Dr. Jacobs stated that, for the past two years, Ms. Romeka had been "antagonistic." She described Ms. Romeka as "displaying signs of paranoia," "toxic," "slopp[y]", "rush[ed]," and "disrespectful." She also expressed concern

4

about Ms. Romeka's handling of the missing patient consent form and indicated that she thought that Ms. Romeka had not taken the problem seriously enough. Dr. Jacobs also recounted incidents of Ms. Romeka's poor job performance and altercations with co-workers. She asked for Ms. Romeka to be removed from her staff. Mr. Osik described his interview with Dr. Jacobs as having set in motion Ms. Romeka's termination.

When Dr. Lerma was interviewed by Dr. Rosen, he said that he had been questioning Ms. Romeka's competency as a radiation therapist. He recounted that he once had to intervene after Ms. Romeka had set up the TrueBeam in a way that could have harmed a patient. According to Dr. Lerma, Ms. Romeka "did not know what she was doing," was rude to staff and physicians, was "difficult to speak with, always in a hurry, and [did] not wish to engage in conversation." When Ms. Romeka was interviewed by Dr. Rosen, she acknowledged that she had yelled at nurses in the ROC.

On May 10, Dr. Rosen and Mr. Osik decided that Ms. Romeka should be terminated and that a lesser form of discipline, such as a transfer to another facility, was not an option because she had falsified medical records.

As a subsidiary of MedStar, RadAmerica followed MedStar's personnel policies, which required an independent investigation by MedStar's human resources ("HR") department to confirm a decision to terminate an employee. Accordingly, on May 10, Dr. Rosen contacted Wendy Greer of MedStar's HR department. He told her about his investigation and asked her to perform her own. Dr. Rosen testified in his deposition that "prior to HR getting involved, [he] and Mr. Osik were already leaning in the direction of termination, but [he] needed HR to get involved to confirm that decision." Ms. Greer stated

5

in an affidavit that "[t]he decision to terminate Ms. Romeka had been made by Dr. Rosen and Mr. Osik on May 10, 2018."

## *Other Job Performance Problems*

On both May 10 and 11, Dr. Lerma witnessed Ms. Romeka engage in conduct that he thought created patient safety issues. Ms. Romeka had been rushing SRS treatments and moving parts of the TrueBeam in a way that compromised patient safety. Dr. Lerma testified that he told Ms. Romeka that "she was not delivering safe radiosurgery treatments." He sent an email to Dr. Rosen which stated: "This new situation is a signaling at a significant safety risk. As chief physicist, I am writing to request to remove Ms. Romeka from treating on the [TrueBeam] until this can be further investigated as to the root cause of why she is rushing treatments."

On May 14, Dr. Rosen forwarded Dr. Lerma's email to the President of RadAmerica, David Spearman. Dr. Rosen informed Mr. Spearman that he and Dr. Lerma had spoken in the morning and that Dr. Lerma would be meeting with Ms. Greer later that day. Separately, Dr. Lerma asked Dr. Jacobs whether he could bar Ms. Romeka from participating in treatment if he thought that was necessary. She authorized Dr. Lerma to do so.

On May 16, another issue surfaced regarding Ms. Romeka's previous falsified medical record. Mr. Osik learned that the Patient Safety Event Report about the incident that Ms. Romeka had submitted at his request was inaccurate. Although the patient had started radiation treatment on April 9, Ms. Romeka incorrectly noted in the report that the patient had started treatment on April 30. Ms. Romeka's report also did not reflect the fact

6

that the patient had finished an entire course of radiation treatment without the requisite consent form. Further, she named Dr. Jacobs as the only "[i]nvolved [p]arty," although she, as the treating therapist, was the principal "[i]nvolved [p]arty." Mr. Osik emailed this information to Dr. Rosen and stated that this "was another example of [Ms. Romeka]'s sloppiness and not taking responsibility as a leader."

### *HR's Investigation*

On May 14, Ms. Greer interviewed Ms. Romeka and seven of Ms. Romeka's co-workers. The interviews corroborated the accounts of Ms. Romeka's behavior at work: people described her as argumentative, disorganized, rushed, unsafe, nasty, and incompetent. According to Ms. Greer, Dr. Lerma described Ms. Romeka as "constantly rushing, seem[ing] anxious, fidgeting with equipment, not calm," and that she "left [things] undone a lot." Dr. Lerma was concerned about her job performance and described the incidents that occurred on May 10 and 11 that he believed created patient safety issues. In addition, Ms. Greer learned from Dr. Jacobs that Ms. Romeka had falsified a medical record.

When Ms. Greer interviewed Ms. Romeka, Ms. Romeka told her that she "always gets consent to treat ahead of time." During her later deposition in this case, Ms. Romeka also denied that she did anything wrong on May 10 and 11.

On May 16, with her investigation completed, Ms. Greer concluded that RadAmerica should terminate Ms. Romeka "based on her conduct, performance, and behavior." She notified Mr. Spearman of that conclusion at some point between May 16 and 18.

7

On May 15, while the investigation and termination processes were proceeding apace, Mr. Blackburn was treating a patient with the TrueBeam when he discovered that the motor in the treatment couch was not working. He "manually rotate[d] the couch to move the patient into the proper position for treatment" and noted that "[t]he treatment couch was not difficult to move and rotated smoothly and carefully." He reported the problem to Dr. Lerma and to Rod White, a Varian employee. Mr. White ordered replacement parts for the treatment couch, but delivery was delayed.

On May 16, Ms. Romeka manually rotated the TrueBeam couch while treating a patient. She did not raise a safety concern about either Mr. Blackburn's manual rotation of the treatment couch on May 15 or her manual rotation on May 16. However, she told Mr. Osik that she injured her hip while manually moving the couch. She testified that she did not raise a patient safety concern when she manually moved the couch because the movement was not significant.

On May 17, two patients with brain tumors were scheduled for SRS treatments with the TrueBeam in the early afternoon. In the morning, Ms. Romeka raised concerns to Dr. Lerma about administering SRS treatments "with a broken couch." She mentioned the safety concerns to Dr. Jacobs and expected the treatments to be cancelled. A Varian engineer explained to Dr. Lerma that SRS treatments could be performed safely on patients by manually rotating the TrueBeam's treatment couch. Dr. Lerma communicated that information to Dr. Jacobs, who decided that they would go forward with the SRS treatments. Dr. Lerma told Dr. Jacobs that he was planning to perform the two treatments

without Ms. Romeka. According to Dr. Lerma, Dr. Jacobs approved of this decision. Dr. Lerma explained in his deposition that Dr. Jacobs's authorization to exclude Ms. Romeka had "nothing to do with the [TrueBeam] couch." Dr. Lerma told Ms. Romeka that she would not be participating in the treatments.

Ms. Romeka contacted Dr. Jacobs and Dr. Rosen and asked why she was excluded from the two treatments. She told Dr. Jacobs that she did not "think pushing the couch for an SRS treatment [was] a good idea." Although she had been told that she would not be participating in the treatment, Ms. Romeka tried to enter the treatment room. Dr. Lerma blocked her from entering, but Ms. Romeka observed the procedure from the control room just outside the treatment room.

Both Dr. Jacobs and Dr. Lerma were in the treatment room for both SRS treatments. Ms. Romeka claimed that she noticed the first patient move out of position during the SRS treatment and requested a confirmatory computed tomography ("CT") image to ensure the radiation had been accurately delivered, but her request was ignored. Dr. Lerma reported that the manual movement of the couch was "smooth" and that the patient did not move during the treatment. Dr. Jacobs corroborated Dr. Lerma's account. The other people in the room did not see the patient move and did not recall Ms. Romeka saying that she saw the patient move. Mr. Blackburn testified that he did not see either patient move during treatment.

Ms. Romeka testified that she told Dr. Jacobs—Mercy's employee—that she would file a grievance "about what I just witnessed in the clinic." Ms. Romeka testified that Mr. Osik told her he would speak with Dr. Rosen and get back to her about the process for

9

filing a grievance. Mr. Osik acknowledged that Ms. Romeka said she wanted to file a grievance, but in his subsequent email to Dr. Rosen, he reported only that she was upset at the way Dr. Lerma was treating her. Dr. Rosen recalled receiving no information about Ms. Romeka's intent to file a grievance.

Later that day, Mr. Osik texted Ms. Romeka that he and Dr. Rosen would meet with her on Monday, May 21, at 9:00 a.m. Ms. Romeka thought—mistakenly, as she would find out—that the meeting was to discuss the process for filing a grievance.

### *The Termination*

The final decision to terminate an employee of RadAmerica rested with RadAmerica's president, Mr. Spearman. Mr. Spearman and Dr. Rosen discussed the fact that Ms. Romeka had falsified medical records. The record reflects that at some point between May 16 and May 18, Mr. Spearman authorized Dr. Rosen to terminate Ms. Romeka. Reviewing the facts in the light most favorable to Ms. Romeka, we assume that this authorization was not given until at least the morning of May 18, after Ms. Romeka informed Mr. Osik of her intention to file a grievance. The record reveals no evidence that either Mr. Spearman, Dr. Rosen, or Ms. Greer knew about Ms. Romeka's complaint regarding the SRS treatments on May 17.

On May 18, Dr. Rosen told Mr. Osik to proceed with the paperwork for Ms. Romeka's termination. Mr. Osik prepared the paperwork and provided it to Ms. Greer just before 4:00 p.m. that same day. Mr. Osik also told Mr. Blackburn that, starting on Monday, May 21, Mr. Blackburn would be the acting Chief Radiation Therapist.

10

On Sunday, May 20, Ms. Greer approved the paperwork for terminating Ms. Romeka.

On Monday morning, Mr. Osik and Dr. Rosen met with Ms. Romeka and terminated her. Ms. Romeka was given a notice that listed the Concern/Issue as "Unsatisfactory Performance" and identified five specific issues: (1) "Lack of communication Patient Safety"; (2) "Disrespectful of staff and physicians"; (3) "Lack of integrity"; (4) "Unsatisfactory Performance"; and (5) "Integrity/Falsification of Medical Record."

### The Circuit Court Action

On May 8, 2019, Ms. Romeka filed a lawsuit in the Circuit Court for Baltimore City. She amended the complaint twice. Ms. Romeka alleged that Employer unlawfully terminated her employment in retaliation for making a protected disclosure under the HCWWPA.

Employer moved for summary judgment on two grounds: (1) Ms. Romeka failed to make a protected disclosure in writing; and (2) Employer had already decided to terminate her before the two SRS treatments on May 17 and terminated her for reasons having nothing to do with the allegedly protected disclosure. Ms. Romeka countered that Employer's stated reasons were merely pretextual and that she was unlawfully terminated in retaliation for complaining about the two SRS treatments on May 17.

After hearing oral argument, the circuit court granted Employer's motion. The court reasoned that Employer "ha[d] demonstrated without dispute that [it was], in fact, in process of terminating Ms. Romeka for reasons other than any conceivable complaint about

11

patient health or safety because it preceded in time any possible such complaint." The court explained:

> [E]ven if I were to resolve the factual disputes in favor of the plaintiff for the fact that she did make a complaint, and that that was her purpose in challenging her exclusion from the treatment room on the afternoon of May 17th, even if I were to indulge her in the possibility that a jury could believe her on that point, it would not amount to causation overcoming what the defendants were already doing in terms of their investigation and their consideration of her status as an employee.

### *The Appellate Court's Decision*

On April 27, 2022, the Appellate Court affirmed the circuit court's decision. *Romeka v. RadAmerica II, LLC*, 254 Md. App. 414 (2022). In a thorough and well-reasoned opinion, the Appellate Court held that the evidentiary framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applied to Ms. Romeka's claim, that the Act required but-for causation to prove liability, and that the uncontroverted evidence established that Ms. Romeka's termination had nothing to do with her alleged protected disclosure. *Romeka*, 254 Md. App. at 453, 455-56, 464.

## DISCUSSION

## I

We begin by addressing the standard of proof for causation under the HCWWPA. As this is a matter of statutory construction, we review the circuit court's decision without deference. *Harvey v. Marshall*, 389 Md. 243, 257 (2005) (questions of statutory interpretation are legal issues reviewed de novo by appellate courts).

Ms. Romeka argues for a "contributing factor" standard of causation under the HCWWPA. She contends that the Act requires a plaintiff to prove only that the adverse

12

personnel action was *motivated by* the plaintiff's protected conduct.  She argues that the Appellate Court erred in relying upon *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), which held that a but-for causation standard applies to retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e.  She also claims support in other federal whistleblower statutes as well as whistleblower statutes from other states.[3]

Ms. Romeka argues that the General Assembly used the word "reprisal" instead of "retaliation" or "discrimination" to distinguish the HCWWPA from Title VII (which uses only the word "discrimination") and to align the HCWWPA with other state whistleblower statutes and wrongful discharge actions.  Further, Ms. Romeka argues that the General Assembly used the word "reprisal" in section 1-502 to reflect that the statute would have "a different scope than Title VII."  Thus, she contends, the HCWWPA imposes only a contributing factor causation standard.

Employer, in contrast, argues that the plain language of the HCWWPA imposes a but-for causation standard.  Employer contends that Maryland has adopted the *McDonnell*

---

[3] In support of her argument, Ms. Romeka cites to 49 U.S.C. § 42121 (b)(2)(B)(i), which provides whistleblower protection for employees disclosing air safety information, and 18 U.S.C. § 1514A, which provides whistleblower protection under the Sarbanes-Oxley Act for employees of publicly traded companies, as well as *Morgan v. Dep't of Energy*, 424 F.3d 1271, 1273 (Fed. Cir. 2005), and *Feldman v. L. Enf't Assocs. Corp.*, 752 F.3d 339, 344-45 (4th Cir. 2014).  However, as Employer points out, the Whistleblower Protection Act, discussed in *Morgan,* and the Sarbanes-Oxley Act, discussed in *Feldman*, apply the contributing factor standard only at the prima facie stage.  Similarly, under 49 U.S.C. § 42121, the contributing factor standard is applied only at the prima facie stage. *Greatwide Dedicated Transp. II, LLC v. United States Dep't of Lab.*, 72 F.4th 544, 553–54 (4th Cir. 2023).

*Douglas* burden-shifting framework for employment claims, that the motivating or contributing factor standard applies only at the prima facie stage of the analysis, and that the but-for causation standard applies at the pretext stage. Employer maintains that the Appellate Court correctly applied the plain language of the HCWWPA and the burden-shifting framework established in *McDonnell Douglas*.

## A

Our "primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). In doing so, we first look to the plain language of the statute. *Id.* at 275; *Mayor of Oakland v. Mayor of Mountain Lake Park*, 392 Md. 301, 316 (2006). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *Lockshin*, 412 Md. at 275. We do not read provisions of a statute in a vacuum, but rather view the relevant provisions in the context "of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276. If the statute is ambiguous, we search for legislative intent in other sources, including legislative history. *Id.*

**B**

Enacted in 2002, the primary purpose of the HCWWPA was to advance public health and safety by protecting whistleblowing health care workers from retaliation by their employers. *Romeka*, 254 Md. App. at 455. After defining certain basic terms in section 1-501, the Act gets right to the point in section 1-502 by prohibiting covered employers from taking certain adverse personnel actions against covered employees.

Specifically, section 1-502 provides:

> [A]n employer may not take or refuse to take any personnel action *as reprisal* against an employee *because* the employee: (1) Discloses or threatens to disclose to a supervisor or board an activity, policy, or practice of the employer that is in violation of a law, rule, or regulation; (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of a law, rule, or regulation by the employer; or (3) Objects to or refuses to participate in any activity, policy, or practice in violation of a law, rule, or regulation.

(Emphasis added). The Act also provides, under section 1-506, that: "In any action brought under this subtitle, it is a defense that the personnel action was based on grounds other than the employee's exercise of any rights protected under this subtitle."

Construed together, sections 1-502 and 1-506 are unambiguous on the standard of causation. Let's start with section 1-502. The opening clause provides that an employer's personnel action or inaction may not be taken "*as reprisal*" for an employee's protected disclosure. Although "reprisal" is not defined in the statute, "we may consider dictionary definitions to ascertain a word's common understanding." *Crawford v. Cnty. Council of Prince George's Cnty.*, 482 Md. 680, 698 (2023) (citing *Berry v. Queen*, 469 Md. 674, 688-90 (2020)). In 2002, the year the HCWWPA was enacted, the Merriam-Webster

15

dictionary defined "reprisal" as "a retaliatory act[.]" *Reprisal*, Merriam-Webster Dictionary (10th ed. 2002). Similarly, the edition of Black's Law Dictionary then in effect defined "reprisal" as "any action taken by one person either in spite or as a retaliation for an assumed or real wrong by another." *Reprisal*, Black's Law Dictionary (6th ed. 1990). Thus, a retaliatory action is an action that is taken in response to something. Common sense tells us that an action is not a response to something if the action would have been taken if that something had never occurred. Accordingly, the word *reprisal* requires but-for causation.

Our interpretation of reprisal is bolstered by the word "because" in section 1-502. In 2002, Merriam-Webster defined "because" as "for the reason that: since[.]" *Because*, Merriam-Webster Dictionary. The word "because" causally links the personnel action to the employee's protected conduct which, in tandem with "reprisal," reinforces the but-for causation standard embedded in the HCWWPA.

Section 1-506 also imposes a but-for causation standard. As stated therein: "In any action brought under this subtitle, it is a defense that the personnel action was based on grounds other than the employee's exercise of any rights protected under this subtitle." HO § 1-506. This means that even if the plaintiff engaged in the protected conduct, the employer still prevails if it proves it would have taken the same action in the absence of the employee's protected conduct. By adding this defense, the General Assembly baked the but-for causation standard directly into the statute.

16

## C

Although the Act tells us *what* the employee must prove to establish causation under the HCWWPA, it doesn't tell us *how* a plaintiff can clear the "but-for" hurdle. Rarely do employers raise their hand and admit to making an adverse employment decision in retaliation for an employee's statutorily protected conduct. *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 n.6 (4th Cir. 2015). More often, a plaintiff will have to stitch together a mosaic of circumstantial evidence to demonstrate a causal connection between the personnel action and protected conduct. *See id*. But if the HCWWPA requires a plaintiff to prove but-for causation, how then could a circumstantial case showing merely a causal connection carry the day? And how can the employee satisfy the but-for causation standard if the employer terminated the employee for multiple reasons, only one of which was to unlawfully retaliate?

The answer lies in the three-step burden-shifting framework established in *McDonnell Douglas*. To establish a prima facie claim of unlawful retaliation under *McDonnell Douglas*, the plaintiff must present evidence showing: (1) "she engaged in protected activity," (2) the "employer took adverse action against her," and (3) "a causal relationship existed between the protected activity and the adverse employment activity." *Foster*, 787 F.3d at 250 (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (cleaned up)). The plaintiff need not demonstrate but-for causation in her prima facie case; she needs to show only that the protected disclosure contributed in some way to the adverse employment action. *Id.* If the plaintiff makes this initial showing, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse

17

employment action. *Id.* If the defendant makes that showing, the burden shifts back to the plaintiff to show that the employer's stated reason for the adverse employment action was not the actual reason, but instead was a pretext for retaliation. *Id.*

In *Foster*, the Fourth Circuit concluded that, in the context of a claim of unlawful retaliation, the *McDonnell Douglas* framework "already incorporates a but-for causation analysis." *Id.* at 249. We agree. If a plaintiff shows the causal connection (a lower burden than but-for) at the prima facie stage and the defendant cannot articulate a legitimate reason for the employment decision, then a jury has a sufficient basis to find, through the process of elimination, that the employer would not have taken the adverse action but for the protected activity. In that respect, a plaintiff who clears the contributing factor hurdle may very well establish but-for causation.

On the other hand, if the plaintiff makes a prima facie case with evidence of a causal connection, and the employer *can* show a legitimate reason for the employment action, the plaintiff is given the opportunity to show that the employer's proffered reason is a pretext. If the plaintiff proves that the reason is a pretext for retaliation, then she has established but-for causation by showing that the action would not have been taken in the absence of her protected conduct.

As the court stated in *Foster*, "[i]f a plaintiff can show that she was fired under suspicious circumstances and that her employer lied about its reasons for firing her, the factfinder may infer that the employer's undisclosed retaliatory animus was the actual cause of her termination." 787 F.3d at 250. The *McDonnell Douglas* framework, therefore,

18

provides plaintiffs with a mechanism to satisfy the but-for causation standard through circumstantial evidence.

This Court's opinion in *Department of Natural Resources v. Heller* is instructive. 391 Md. 148 (2006). *Heller* involved a retaliation claim under Maryland's whistleblower statute applicable to the executive branch of Maryland's government (the "Executive Branch Whistleblower Act"), as stated in the State Personnel and Pensions Article of the Maryland Annotated Code ("SPP") §§ 5-301 to 5-314 (1993, 2015 Repl. Vol.). The Executive Branch Whistleblower Act protects covered employees against adverse personnel actions as a "reprisal" for making protected disclosures. SPP § 5-305. Further, section 5-302(b) "does not prohibit a personnel action that would have been taken regardless of a disclosure of information." Thus, the Executive Branch Whistleblower Act, like the one at issue here, requires but-for causation.

In *Heller*, an Administrative Law Judge (the "ALJ") found that the employee had not established that he made a protected disclosure. 391 Md. at 151-52. The circuit court affirmed the decision of the ALJ. *Id.* at 163. The Appellate Court of Maryland reversed and, *inter alia*, held that the ALJ incorrectly ruled that the employee's disclosures were not protected. *Id*. This Court, however, reversed the Appellate Court.

In doing so, we discussed the *McDonnell Douglas* burden-shifting framework. In a sentence embraced by Ms. Romeka, we said that "[a] whistleblower action by the employee intended to overturn a personnel action also will succeed only if the employee shows by a preponderance of the evidence that the protected disclosure was a 'contributing factor' in the decision to take the personnel action." *Id*. at 171. Ms. Romeka interprets this sentence

19

as confirmation that a whistleblower need not climb the steep hill of but-for causation, but instead need only satisfy a "contributing factor" standard. We disagree.

In saying that a plaintiff will succeed only if she shows that the adverse employment decision was a contributing factor, we weren't holding that the statute imposed a contributing factor causation standard, but rather identifying the initial hurdle that a plaintiff must clear to succeed in such a claim. That is, every successful plaintiff must at least satisfy the "contributing- factor" standard at the prima facie stage, and conversely, no plaintiff who cannot satisfy the "contributing factor" standard will succeed. Indeed, just two sentences after the one that Ms. Romeka quotes from in *Heller*, we explained that, under the *McDonnell Douglas* framework, once the plaintiff makes the initial showing, then "the employer will only escape liability by proving that the employer would have taken the same personnel action in the absence of the protected disclosure." *Id*. at 171. In other words, in *Heller*, applying a whistleblower statute similar to the HCWWPA, this Court explained how a plaintiff can establish but-for causation using the *McDonnell Douglas* burden-shifting framework. Ms. Romeka's reliance on *Heller* as authority for a lower causation standard is misplaced.

Nor do we agree with Ms. Romeka that a but-for causation standard undermines the public policy behind the HCWWPA. As the Appellate Court aptly explained:

> Title VII and other anti-discrimination laws serve the broad, overarching purpose of rooting status-based discrimination out of the workplace (and other venues). This purpose cannot be achieved if discrimination is tolerated when it is even **one** motivation, among other motivations that are legitimate, for an adverse personnel action. The particularized purpose of the HCWWPA—to enhance safety in the health care sector by protecting health care workers from reprisal for protected disclosures—stands in contrast to

20

the general aim of antidiscrimination laws. The purpose of the Act will not be advanced unless retaliation for making a protected disclosure is the actual reason the employer took the personnel action against the employee.

*Romeka*, 254 Md. App. at 455.

Accordingly, we hold that under the HCWWPA, a plaintiff must prove that, but for the protected disclosure, the employer would not have taken the adverse personnel action. We further hold, consistent with *Heller*, that a plaintiff can establish but-for causation through the *McDonnell Douglas* analytical framework.

**II**

We now turn to whether the circuit court properly granted summary judgment to Employer. As with our review of the statutes under the Act, we review the circuit court's decision without deference. *Webb v. Giant of Md., LLC*, 477 Md. 121, 135 (2021) (summary judgment review is de novo).

In our review, we determine (1) "whether a dispute of material fact exists," and (2) "whether the trial court was legally correct." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 93 (2000); *see also* Md. Rule 2-501(f). For the purposes of summary judgment, a material fact is "a fact the resolution of which will somehow affect the outcome of the case." *USA Cartage Leasing, LLC v. Baer*, 202 Md. App. 138, 174 (2011), *aff'd*, 429 Md. 199 (2012) (quoting *Barbre v. Pope*, 402 Md. 157, 171-72 (2007)). "[W]e independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Myers v. Kayhoe*, 391 Md. 188, 203 (2006). We view the record "in the light most favorable to the non-moving party and construe any reasonable inferences that

21

may be drawn from the facts against the moving party." *Rhoads v. Sommer*, 401 Md. 131, 148 (2007); *Myers*, 391 Md. at 203.

Maryland Rule 2-501(b) requires the party opposing a properly supported summary judgment motion to:

> (1) identify with particularity each material fact as to which it is contended that there is a genuine dispute and (2) as to each such fact, identify and attach the relevant portion of the specific document, discovery response, transcript of testimony (by page and line), or other statement under oath that demonstrates the dispute.

Here, the summary judgment record consisted of, among other things, affidavits from Mr. Blackburn, Ms. Cangonji, Ms. Greer, and radiation therapist Stacey Kerner; excerpts from depositions of Dr. Lerma, Ms. Romeka, Dr. Jacobs, Mr. Osik, and Dr. Rosen; and personnel records and contemporaneous notes of conversations taken by Mr. Osik, Dr. Rosen, and Ms. Greer. These materials, taken in the light most favorable to Ms. Romeka, established the following undisputed facts:

1. From early to mid-May of 2018, Ms. Romeka's employment conduct was twice investigated—first by Mr. Osik and Dr. Rosen, and second by Ms. Greer.

2. Both investigations revealed that Ms. Romeka falsified a medical record.

3. Both investigations revealed that Ms. Romeka mistreated co-workers. On May 10, both Mr. Osik and Dr. Rosen concluded that Ms. Romeka should be terminated, subject to confirmation by Medstar's HR department.

4. Pursuant to Medstar's policy, on May 10, Dr. Rosen contacted Ms. Greer, who worked in Medstar's HR department, about their desire to terminate Ms. Romeka. Ms. Greer told Dr. Rosen that she would conduct her own investigation "and would discuss getting approval to move forward with Ms. Romeka's termination."

5. Ms. Greer began her investigation on May 14 and interviewed eight individuals, including Ms. Romeka's close co-workers and Ms. Romeka.

6. Ms. Greer concluded her investigation on May 16 and "confirmed that Ms. Romeka should be terminated based on her conduct, performance, and behavior."

7. On May 17, Ms. Romeka made the disclosure to Mr. Osik regarding her concerns about patient safety with the manual movement of the TrueBeam and her intention to file a grievance.

8. Ms. Greer informed Mr. Spearman, RadAmerica's president, of her conclusion that Ms. Romeka should be terminated. Viewing the evidence in the light most favorable to Ms. Romeka, Mr. Spearman, who had final authority to terminate employees, decided on the morning of May 18 to terminate Ms. Romeka and authorized Dr. Rosen to proceed.

9. Neither Ms. Greer, Dr. Rosen, nor Mr. Spearman was aware of Ms. Romeka's May 17 complaint when Mr. Spearman made the final decision to terminate her.

Ms. Romeka argues that the foregoing facts rest on the credibility of the witnesses. For example, she contends that key points on this timeline were established in Ms. Greer's affidavit, which Ms. Romeka discounts as having been "produced in the context of this litigation, not at the time the events therein described occurred." She argues that a jury could credit "emails and other evidence in the record" over Ms. Greer's account of the events. And she points to various emails that, she contends, "cast[] doubt on Ms. Greer's timeline of events."

Under Rule 2-501, however, supporting affidavits to summary judgment motions are typically prepared and signed in the context of litigation. To contest Ms. Greer's affidavit, Ms. Romeka must come forward with evidence that calls into question Ms. Greer's version of events. *See Myers*, 391 Md. at 203. This she did not do.

The emails Ms. Romeka references do not generate a genuine dispute with any of the above facts. For example, Ms. Romeka points to an email from Dr. Lerma to Dr. Rosen on May 11, in which he asked that Ms. Romeka be removed only "from treating on the [linear accelerator] until this can be further investigated as to the root cause." Ms. Romeka argues that this email does not "establish, nor even imply, that Dr. Lerma intended to terminate Ms. Romeka." But this is of no moment. Dr. Lerma was not one of the decision-makers.

Ms. Romeka also points to Dr. Rosen's deposition testimony that, after speaking with Dr. Jacobs, he concluded that it was "clear that we needed to pursue some type of mitigation." As Ms. Romeka sees it, that testimony, combined with her assertion that RadAmerica's practice was to transfer, not fire, problematic employees, creates an issue of fact as to whether RadAmerica decided to terminate her for reasons other than her safety complaint. However, immediately after that testimony, Dr. Rosen explained that Dr. Jacobs had "asked that [Ms. Romeka] be removed," as was Dr. Jacobs's right under RadAmerica's contract with Mercy. Dr. Rosen further explained that he had considered transferring Ms. Romeka but decided against it because she had falsified medical records, leaving Employer's "hands []tied" and "with no other alternative but to terminate."

Ms. Romeka acknowledges that there is no evidence that Mr. Osik informed Dr. Rosen or Mr. Spearman about her safety complaint. She claims that Mr. Osik, who had a significant role in the decision to terminate her, "frustrat[ed] the handling of Ms. Romeka's complaint at every turn, while simultaneously driving her termination." Thus, she concludes, "a reasonable trier of fact [could] find that RadAmerica through Mr. Osik, did

24

indeed retaliate against Ms. Romeka." The logic of this argument is difficult to follow, but Ms. Romeka seems to be arguing that Mr. Osik retaliated against her for making a protected disclosure by ensuring that those who were deciding her fate—Dr. Rosen and Mr. Spearman—made their decision without any knowledge of her complaint. How this argument helps Ms. Romeka's cause eludes us. It seems obvious that by not telling Dr. Rosen and Mr. Spearman about her complaint, Mr. Osik protected Ms. Romeka against the possibility that an impermissible consideration would factor into the decision to terminate her.

In sum, Employer supported its summary judgment motion with undisputed evidence that, without knowledge of Ms. Romeka's alleged protected disclosure, Dr. Rosen recommended to Mr. Spearman that they terminate Ms. Romeka because two investigations revealed that, among other performance problems, she had falsified a medical record and mistreated staff. Employer also demonstrated that Mr. Spearman had the final say in the termination decision and that he too was not informed about her allegedly protected disclosure. Because Ms. Romeka failed to generate a genuine dispute as to either fact, Employer was entitled to summary judgment as a matter of law pursuant to section 1-506 of the HCWWPA.

## CONCLUSION

For the foregoing reasons, we hold: (1) a claim under the HCWWPA requires proof of but-for causation; (2) a plaintiff may avail herself of the burden-shifting framework established by *McDonnell Douglas* to prove but-for causation; (3) Ms. Romeka failed to genuinely dispute Employer's evidence that she was terminated for reasons unrelated to

25

her alleged protected disclosure; and (4) the circuit court correctly determined that Employer was entitled to judgment as a matter of law.

Accordingly, we affirm the judgment of the Appellate Court of Maryland.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**