*Kasmir v. Retail Services & Systems, Inc.*, No. 1778, September Term, 2023.  Opinion by Graeff, J.

**EMPLOYMENT—RETALIATION—SUMMARY JUDGMENT**

An employee claiming retaliation must first establish a prima facie case of retaliation. Once the employee meets this burden, the burden shifts to the employer to establish a non-retaliatory reason for the adverse action.  If the employer does so, the burden shifts back to the employee to show that the proffered reasons were a pretext.  To overcome a motion for summary judgment, the non-moving party must present evidence that supports the assertions made rather than speculation or personal opinion.

To establish a prima facie case, a plaintiff must produce evidence that: (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse action against the plaintiff; and (3) the employer's adverse action was causally connected to the protected activity.  Ms. Kasmir failed to produce evidence that her demotion in July 2020 was casually connected to her complaint of age and gender discrimination in May 2019.  Even assuming that other events shortened the relevant time period between the protected activity and the adverse action to nine months, that time period is too long, by itself, to establish a prima facie case of causation based on temporal proximity.  Ms. Kasmir failed to show causation based on a "proximity plus analysis."  Although she was placed on an action plan several months after she filed her complaint, and she subsequently was placed on a performance improvement plan, these actions were insufficient to support an inference of causation between her protected activity and her demotion where Ms. Kasmir failed to show that Mr. Haubenstricker, the person who made the decision to demote her, was involved in these actions or had knowledge of her protected activity.  The circuit court properly found that Ms. Kasmir failed to make a prima facie case of retaliation because she failed to show a causal connection between her protected activity and her demotion.

The circuit court also properly found that Ms. Kasmir failed to establish any disputes of material fact that would permit a jury to find that employer's proffered reasons for the demotion, poor job performance requiring a restructuring of her position, were pretextual. Ms. Kasmir offered no evidence, other than speculation, that these reasons were false.  Her own view of her performance was not relevant to her employer's belief regarding her ability.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1778

September Term, 2023

_____

DEBORAH KASMIR

v.

RETAIL SERVICES & SYSTEMS, INC.

_____

Graeff,
Nazarian,
Shaw,

JJ.

_____
_____

Opinion by Graeff, J.

_____

Filed: January 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

This appeal arises from a complaint filed by Deborah Kasmir, appellant, in the Circuit Court for Montgomery County, against Retail Services and Systems, Inc. ("RSSI"), appellee. The complaint alleged that RSSI engaged in gender discrimination, age discrimination, and retaliation in violation of Montgomery County Code ("MCC") § 27-19. RSSI filed a Motion for Summary Judgment, which the circuit court granted.

On appeal, appellant presents three questions for this Court's review,[1] which we have consolidated into the following question:

> Did the circuit court err in granting RSSI's Motion for Summary Judgment with respect to Ms. Kasmir's claim of retaliation?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

---

[1] Ms. Kasmir's questions presented are as follows:

1. Whether the Circuit Court erred when it found that the only adverse action taken against Kasmir was her demotion, although she was also given a performance improvement plan, a lower performance review than prior evaluations, and issued an action plan before her demotion.

2. Whether the Circuit Court erred when it found that no causal nexus existed between Kasmir's protected activity and her subsequent demotion based on temporal proximity, despite a continuing series of retaliatory actions in the intervening time period.

3. Whether the Circuit Court erred when it found that Kasmir failed to present sufficient evidence to rebut RSSI's proffered legitimate business reason by relying on its own credibility determinations.

FACTUAL AND PROCEDURAL BACKGROUND

## I.

### Background and Ms. Kasmir's Early Years at RSSI

RSSI provides administrative services to retail stores operating under the "Total Wine" brand name. Ms. Kasmir began working as a Facility Manager for RSSI in March 2009. At that time, she was managing 55 Total Wine retail stores. In 2011, Ms. Kasmir was promoted to Director of Facilities Management. By 2018, she was responsible for 220 Total Wine retail stores.

Between 2015 and 2017, Sumeet Mittal served as Ms. Kasmir's supervisor. Mr. Mittal rated Ms. Kasmir as "exceeds expectations" in her 2016 performance review. Mr. Mittal gave Ms. Kasmir the same performance rating in 2017, but he noted in his review that Ms. Kasmir needed "to focus on building relationships in the company and sharing her softer side with her team by acknowledging their good work in the moment and celebrating with them."

Over the years, several of Ms. Kasmir's direct reports made complaints against her. In May 2015, Christine Fernandes, one of Ms. Kasmir's direct reports, emailed human resources about an "ongoing issue" the team was having with Ms. Kasmir. Ms. Fernandes stated that working under Ms. Kasmir's management was becoming increasingly difficult, noting that the team was subject to "continuous and redundant lectures, sarcasm, and [an] unapproachable nature" that Ms. Kasmir brought to the team. In spring 2016, another subordinate complained that Ms. Kasmir had retaliated against her. The complaint resulted

in an investigation, and human resources determined that Ms. Kasmir had "mishandled her communication" with the subordinate.

## II.

### Concerns about Ms. Kasmir's Performance

In 2018, RSSI hired Ryan Hill as Vice President of Store Development. Ms. Kasmir reported directly to Mr. Hill, and Mr. Hill reported directly to Troy Rice, the then-Chief Stores Officer. Natalie Poustinchi, a "business partner" from Human Resources who was assigned to Mr. Hill's team, testified at her deposition that Mr. Hill had a "different style" than previous supervisors. He was more present than previous supervisors, holding "one-to-one meetings to check on work" and the team's "progress on the stores." Mr. Hill "expected people to deliver." His communication style, however, could "make others feel a little bit small in the room or that . . . they didn't feel competent."

A few months after he was hired, Mr. Hill became concerned about Ms. Kasmir's performance. These concerns revolved around Ms. Kasmir's inability to meet the "expectations of her position" and of the company. Ms. Kasmir seemed "open and willing to address some of those expectations," but she appeared "unwilling or unable" to address others. Ms. Kasmir acknowledged that she was lacking in certain skill sets, "like the use of Microsoft Excel and PowerPoint," but she seemed hesitant, or unwilling, to address

those deficiencies. Mr. Hill shared his concerns with Ms. Poustinchi that Ms. Kasmir was "not performing at a director level."[2]

In April 2019, Mr. Hill delivered Ms. Kasmir's performance review for 2018. He rated her performance as "meets expectations."[3] As 2019 progressed, Mr. Hill noticed that Ms. Kasmir demonstrated a willingness "to embrace feedback and incrementally try to make improvements."

### III.

### Ms. Kasmir Complains of Discrimination and Retaliation

On May 15, 2019, Ms. Kasmir emailed Vanessa Bernarding, Vice President of Human Resources, to lodge a complaint regarding discrimination based on gender and age. She stated that the "primary person" she was upset with was Mr. Hill, noting that she "did not like the way that he talked to her, and she was concerned that he might be discriminating against her based on her age or her gender."[4]

---

[2] Mr. Hill also expressed concern about three additional employees. Two of those employees were project managers, one of whom was terminated because of poor performance.

[3] Ms. Kasmir's performance review noted the following strengths: "(1) work ethic, (2) penchant for follow up and control, (3) discipline and toughness, (4) ability to get things done." It also noted the following opportunities for improvement: "(1) attention to detail; (2) instinct to verify audit what is being reported; (3) functional analysis, economic sense and financial management skills; (4) people sense, genuine empathy for others and ability to nurture others to learn, grow, develop, and succeed; (5) playing the victim versus owning her circumstances."

[4] The relevant excerpts from Ms. Kasmir's email are as follows:

On May 21, 2019, approximately one week later, Ms. Bernarding and Ms. Kasmir met to discuss Ms. Kasmir's complaint. Ms. Bernarding subsequently began an investigation. Although she could not remember the exact details of her investigation, Ms. Bernarding opined that she would have asked Ms. Kasmir questions and "tried to understand if there were people who would have been able to observe any concerns that she shared and/or I would have met with team members who I might be able to try to get a sense of are they feeling or seeing something similar to what" Ms. Kasmir described. Ms. Bernarding recalled speaking with Ken Chance, Robin O'Brien, and Mr. Hill. She stated

---

I believe that I am being targeted because of my age. For example, when I first met with Ryan [Hill] shortly after he started, Ryan made a comment to me about how sometimes people might be set in their ways and are like leopards that cannot change their spots. This was an ageist comment directed at me. . . . Additionally, Ryan has made repeated comments that I need to "catch up" on software and improve my computer skills. While I always welcome the opportunity for development, I think the continual comments that I need to "catch up" are ageist.

\* \* \*

In April 2019, Tom Kooser referred to me as a "veteran" employee, which I believe is the equivalent of calling me old or an old-timer.

\* \* \*

Finally, I have received feedback from Ryan and my former supervisors, Sumeet Mittal and Roger Wright, that I need to show my softer side to my team and to talk about my family and personal life with my team in order to seem more approachable. I am not aware of men receiving similar feedback nor do I think that Ryan, Sumeet, or Roger would tell any men that they supervise to show their softer side and talk about their families. I am concerned the feedback I have received about how I supervise and communicate appears to have a gender bias. I worry that I am not being evaluated fairly as a result.

5

that she would have shared with Mr. Hill "that there were concerns," but she would not have shared that the concern came from Ms. Kasmir unless she had told Ms. Kasmir she "needed to do that." Ms. Bernarding could not recall whether she told Ms. Kasmir that she was going to disclose that information to Mr. Hill.[5]

On June 23, 2019, Ms. Kasmir sent a follow-up email to Ms. Bernarding regarding her complaint. Ms. Kasmir reiterated that she felt that she was "being unfairly criticized as a woman for not being as 'nice and soft'" as Mr. Hill expected from a female employee. She thanked Ms. Bernarding for reviewing and editing an email draft from Ms. Kasmir to Mr. Hill and expressed concern about retaliation, stating "[n]ow that [Mr. Hill] is aware of my complaint, I am concerned that he will retaliate against me."[6]

On July 16, 2019, Ms. Kasmir emailed Ms. Bernarding and asked her to elevate Ms. Kasmir's "concerns to the highest levels of management." On July 23, 2019, Ms. Kasmir met with Ms. Bernarding and Robert Shaffer, Total Wine's General Counsel, to discuss the findings from the investigation. Ms. Bernarding explained that she was "unable to substantiate any of [Ms.] Kasmir's claims that [Mr.] Hill was treating her unfairly or discriminating against her on account of her age or gender." She stated, however, that it was clear that Mr. Hill believed Ms. Kasmir was "underperforming," and Ms. Kasmir

---

[5] Mr. Hill stated that, sometime in the spring or summer of 2019, human resources "had mentioned that there were multiple accusations [Ms. Kasmir] had made about multiple people," but he was not aware that he was under investigation until November 2022.

[6] After reviewing the record, we were unable to find a copy of the email Ms. Kasmir sent to Mr. Hill.

6

"needed help communicating" with Mr. Hill and "following up on certain tasks and assignments."

Ms. Kasmir stated in an affidavit that, on July 26, 2019, during Ms. Kasmir's mid-year check-in, Mr. Hill asked her to "focus on improving several items that would be difficult or impossible to accomplish with the lack of support [she] was receiving from staff and management." She stated that Mr. Hill imposed unreasonable deadlines at this meeting.

On July 30, 2019, Ms. Kasmir sent another email to Ms. Bernarding. She stated that she felt Mr. Hill's actions at the mid-year check-in constituted retaliation for her "disclosure of discrimination and the ensuing internal investigation."

## IV.

### Action Plan, Performance Improvement Plan, and Written Warning

Mr. Hill testified at his deposition that human resources suggested that they create an action plan for Ms. Kasmir to "specifically spell out and communicate . . . a record" that would help Ms. Kasmir "improve her performance so that there were measures and time frames in which [RSSI] could measure those results and her ability to meet the expectations of the role." Human resources helped him draft the action plan, and Ms. Kasmir was also part of the drafting process. In August 2019, he issued the action plan to Ms. Kasmir and explained that it was an accountability tool for both himself and Ms. Kasmir. Ms. Poustinchi, Mr. Hill, Ms. Kasmir, and Mr. Rice all signed the "Record of Team Member Communication" documenting the action plan. Ms. Kasmir stated in an affidavit that she later understood "that the 'Action Plan' was to resolve communication and listening issues

7

and develop a working relationship between [her and Mr. Hill], rather than being related to any performance issues."

Human resources asked Mr. Hill to keep the document updated so Ms. Kasmir's performance could be assessed. Ms. Kasmir, Mr. Hill, and others in human resources who reported to Ms. Bernarding reviewed Ms. Kasmir's progress at periodic check-ins. This progress was then recorded in the action plan.

Mr. Hill updated the action plan on September 28, October 4, November 15, and December 7, 2019, with respect to the 60-day and 90-day milestones. The updates reflected deadlines that Ms. Kasmir missed and deficiencies in her performance.

On October 14, 2019, Ms. Kasmir sent Ms. Bernarding another email. She cited concerns about micromanagement, Mr. Hill's demeaning comments to Ms. Kasmir and her team, and "retaliation for trying to utilize and partner with the Finance team to create the most accurate 2019 forecasts and budgets possible."

In January 2020, Mr. Hill, Ms. Poustinchi, and Troy Rice, the Chief Stores Officer at the time, issued a written warning to Ms. Kasmir because she did not "meet[] the performance expectations required of the Director, Facilities Management role." For example, Ms. Kasmir failed to: (1) meet the agreed-upon deadline for budget completion because "the numbers did not add up correctly" and the "data did not support the narrative/story being presented"; (2) address the root causes of certain recurring problems; (3) meet the deadline for producing a procurement roadmap; and (4) articulate areas of improvement for her team members and identify training to support those members. Ms.

Kasmir was placed on a Performance Improvement Plan ("PIP").[7] The warning set a follow-up date on March 4, 2020. Under the heading "Consequences of Failure to Improve," a checkmark was placed next to the box reading "Further Disciplinary Action."

Ms. Kasmir stated in her affidavit that, when she was placed on the PIP,[8] Mr. Hill told her verbally that she would be "terminated in two months' time." In a separate declaration, Ms. Kasmir acknowledged that Ms. Bernarding told her a few weeks later that she "would not be terminated because of the PIP."

Ms. Kasmir stated that, from January to March 2020, her "situation" with RSSI "became less tenuous," and she believed RSSI "might finally be giving [her] the fair opportunity to succeed." Ms. Kasmir received a 1% salary increase in June 2020.

## V.

**Leadership Changes and Ms. Kasmir's Performance Remains Unsatisfactory**

In early March 2020, Mr. Hill left RSSI to accept a position with another company. Jim Brendle replaced Mr. Hill, and Ms. Kasmir began reporting directly to him. Mr. Brendle stated that, at the time he was hired, he heard that there had been issues with Ms. Kasmir in the past, but he "really wasn't that knowledgeable" about the issues. He was

---

[7] Ms. Bernarding stated in her affidavit that a PIP is "a commonly used performance management tool designed to give non-performing employees an opportunity to meet performance expectations and avoid possible termination."

[8] Mr. Hill stated he never discussed terminating Ms. Kasmir with human resources. He also denied telling Ms. Kasmir that she would be terminated, in two months or at any other time.

told about employees who could improve performance and was told to evaluate them himself and work with them to "improve their performance."

Mr. Brendle testified in his deposition that Ms. Kasmir subsequently told him that she felt that RSSI had discriminated against her. When he asked her whether she felt that he had discriminated against her, she said "[a]bsolutely not."

Mr. Brendle saw Ms. Kasmir daily, and he observed early on that she talked down to her employees. He discussed this with her several times, but her communication style did not change. By early summer 2020, Mr. Brendle determined that Ms. Kasmir "was struggling in her role as a manager of both corporate and stores facilities and could not effectively perform that job." Ms. Kasmir was unable to accurately tally the Personal Protection Equipment available for shipment in RSSI's inventory, a task that "was so important" during the COVID-19 pandemic. Ms. Kasmir lacked "technical competency to understand some of the scope of her position," she had a misplaced understanding of financial issues, she was reluctant to embrace change, and she had a general unwillingness to follow Mr. Brendle's directions or instructions. Mr. Brendle raised these concerns repeatedly with Mr. Rice and with human resources.

As a result of concerns regarding Ms. Kasmir's performance, Mr. Brendle suggested that RSSI bifurcate Ms. Kasmir's position and team into two positions and two teams. One team would manage the stores' facilities, and the other would manage corporate facilities. Mr. Brendle decided not to terminate Ms. Kasmir because he "thought she had value" and "she knew the company."

10

**Ms. Kasmir Offered A Different Position or Termination**

On approximately July 14, 2020, Ms. Kasmir received her 2019 performance review. She stated in her affidavit that Mr. Rice "decided to reintroduce the PIP from January of 2020," and he stated that her employment "would be contingent upon a review and job performance assessment" from Mr. Brendle. Ms. Kasmir stated in her affidavit that she received a performance review the following day, July 15, 2020, from Mr. Brendle and Donna Schweer, Mr. Brendle's human resources business partner, for the time period that she had been reporting to him. The affidavit detailed her activities during that time, but it did not provide the evaluation given.

Several days later, on July 20, 2020, Ms. Kasmir met with Tom Haubenstricker, Chief Financial Officer, and Ms. Bernarding. They gave Ms. Kasmir the option to either (1) change positions within the company or (2) stay in her director position for three months, after which the position would be eliminated.[9] Mr. Haubenstricker stated in his deposition that he, Ms. Bernarding, and Mr. Rice made the decision to "restructure the department," to turn Ms. Kasmir's position into two roles, and to offer Ms. Kasmir the "lesser" role managing corporate facilities. He explained that several factors went into this decision, most significantly the view that Ms. Kasmir "was struggling from a performance standpoint with meeting the requirements of the job as it existed at that time." Moreover, given that the job was going to get more complex because of anticipated growth in stores

---

[9] Ms. Bernarding described Ms. Kasmir's second option as receiving "a severance package based on her tenure with the Company."

and the implications of COVID, the decision to restructure the department was a way to deal with a significant problem. Mr. Haubenstricker's recollection was that Mr. Brendle did not weigh in on the decision, but they discussed it with him, and he was supportive of the decision.

On July 24, 2020, Ms. Kasmir accepted the Senior Manager position offered by RSSI. Using "actual compensation data reported by comparable businesses for similar jobs in the Delaware/Maryland/Virginia" area, RSSI generated a salary range for the new position and selected "the highest end of that range to offer" Ms. Kasmir as a salary.

## VII.

### Complaint with Office of Human Rights & Subsequent Mediation

Ms. Kasmir subsequently filed a complaint with the Montgomery County Office of Human Rights ("OHR"), alleging age and gender discrimination and retaliation.[10] Ms. Kasmir listed the date of harm as July 24, 2020 and indicated that she was open to mediation. RSSI accepted the offer to mediate.

On June 21, 2021, RSSI offered Ms. Kasmir the position of Director, SSC and Support Facilities with a salary of $185,880, the same salary that Ms. Kasmir made in her previous role. She accepted the offer. RSSI also paid Ms. Kasmir back pay.

---

[10] Ms. Kasmir stated in her deposition that she was not aware whether the complaint was still pending with OHR.

## VIII.

## Initial Filings in the Circuit Court

On December 15, 2021, Ms. Kasmir filed suit against RSSI in the Circuit Court for Montgomery County, alleging gender discrimination, age discrimination, and retaliation under MCC § 27-19. She alleged that, due to RSSI's conduct, she sought damages for the following: "costs of litigation, attorneys' fees, emotional distress, and all other forms of economic, compensatory, and punitive damages."[11]

On March 7, 2022, RSSI filed a Motion to Dismiss Complaint, or Alternatively, for Summary Judgment. It argued that Ms. Kasmir had failed to state a claim for discrimination and/or retaliation, and the complaint, which failed to include the amount of damages sought, was "procedurally defective for failing to comply with Rule 2-305."[12]

On March 22, 2022, Ms. Kasmir filed an amended complaint. RSSI filed a Renewed Motion to Dismiss First Amended Complaint, which the court ultimately granted in part and denied in part.

---

[11] Ms. Kasmir acknowledged in her deposition that RSSI restored any lost financial compensation, and she was not seeking additional pay.

[12] Maryland Rule 2-305 provides as follows:

A pleading that sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for the relief sought. Unless otherwise required by law, (a) a demand for a money judgment that does not exceed $75,000 shall include the amount of damages sought, and (b) a demand for a money judgment that exceeds $75,000 shall not specify the amount sought, but shall include a general statement that the amount sought exceeds $75,000. Relief in the alternative or of several different types may be demanded.

On July 21, 2022, Ms. Kasmir filed a second amended complaint, alleging gender discrimination and retaliation under § 27-19 of the Montgomery County Code. On August 5, 2022, RSSI filed its Answer.

## IX.

## Motion for Summary Judgment

On January 13, 2023, RSSI filed a Motion for Summary Judgment, attaching 16 supporting exhibits. As relevant to the issue on appeal, RSSI argued that, as a matter of law, Ms. Kasmir could not establish retaliation because none of the alleged adverse actions, beyond the decision to move Ms. Kasmir to a new position, resulted in "any material change to her employment."[13] Moreover, she did not provide sufficient evidence to prove "that the *action was motivated* by or in retaliation for" her protected activity, defined as her 2019 complaint of discrimination by Mr. Hill. It noted: (1) that multiple witnesses attested to the fact that RSSI's "decision was based on the determination that the combined facilities role had become too large for [Ms.] Kasmir to handle and that the growth of the business and challenges of COVID created an urgent business need to improve facility services to the stores and corporate offices"; (2) that Mr. Hill was not involved in the decision to demote Ms. Kasmir because he was no longer employed by RSSI; and (3) there was a significant "temporal disconnect between her complaint to HR and the change in

_____

[13] RSSI stated that Ms. Kasmir defined the adverse actions as the action plan, verbal threat of termination, repeated subjugation to "unreasonable deadlines and unclear communication," poor performance reviews, and the PIP.

position." RSSI further argued that Ms. Kasmir could not demonstrate that RSSI's "non-discriminatory reason for changing her rank, salary and bonus was pretextual."

On January 27, 2023, Ms. Kasmir filed an opposition to RSSI's motion for summary judgment, attaching 11 supporting exhibits. Ms. Kasmir argued that a reasonable jury could determine that RSSI both discriminated and retaliated against her. With respect to retaliation, Ms. Kasmir argued that she had suffered several adverse actions, which "represent[ed] an employer's doubt with an employee's quality of work," and each had "the potential to jeopardize a successful future career and opportunities for upward movement." She asserted that because her "emails to Human Resources are plainly protected activity, and [Mr.] Hill's supervisory responses to such emails would 'dissuade a reasonable employee from reporting discrimination,' this close timeframe alone establishes causation for the purpose of [Ms.] Kasmir's prima facie case." She further argued that her only burden was to "demonstrate that the retaliators were aware of her protected activity," which she had "clearly established" by demonstrating that "the primary decision makers in each decision of adverse action taken against [Ms.] Kasmir were influenced by [Mr.] Rice and [Ms.] Bernarding's recommendation, who were both aware of [Ms.] Kasmir's prior complaints."

On May 30, 2023, the court held a hearing. At the hearing, RSSI stated that, for purposes of this hearing, it did not dispute that Ms. Kasmir engaged in protected activity when she complained to human resources in May 2019. It argued that subsequent events, including the PIP and the action plan, did not constitute adverse actions because they did not result in a change in salary or pay. Rather, the only adverse action at issue was the

15

demotion that happened in July 2020. RSSI argued that the decision to demote Ms. Kasmir was not motivated by discrimination, and accordingly, Ms. Kasmir was unable to establish causation.

In response, Ms. Kasmir argued that being "placed on a performance improvement plan, given a lower performance review than prior evaluations, issued an action plan, and ultimately demoted" were all adverse actions because they "significantly change[d] her employment status and could certainly dissuade a reasonable employee in a similar situation not to make or support a complaint of a discrimination." In addressing whether her protected activity caused an adverse event, Ms. Kasmir stated that "key events in the timeline" included: (1) July 16, 2019, when she "emailed human resources asking that they elevate her already filed discrimination complaint to higher levels of management"; (2) July 26, 2019, when she and Mr. Hill met for a midyear check-in and Mr. Hill "instruct[ed] her to meet impossible deadlines and refus[ed] to provide [her] with the resources that she need[ed]"; (3) July 30, 2019, when she "once again reported retaliatory conduct by Mr. Hill to human resources"; and (4) August 2019, when she was put on the action plan.[14] Based on "how close in time each of those events occurred," Ms. Kasmir contended that "a reasonable jury could come to the conclusion that [RSSI] was motivated by the complaints that [she] continued to make and had a retaliatory animus toward her."

---

[14] At the hearing, Ms. Kasmir did not discuss the October 14, 2019 email to Ms. Bernarding, which allegedly reported Mr. Hill's "demeaning comments and retaliation." In her Second Amended Complaint, however, Ms. Kasmir identified this event as a protected activity.

16

# X.

## Circuit Court's Decision

On October 10, 2023, the court issued a memorandum opinion and order granting RSSI's motion for summary judgment. With respect to the retaliation claim, the court found that Ms. Kasmir failed to establish a causal connection between her protected activity, the complaint of discrimination in May 2019, and the adverse action by RSSI, her demotion from Director to Senior Manager in July 2020. It stated that Ms. Kasmir failed to establish "any direct or indirect evidence" of a causal nexus between her protected activities and her demotion. The court stated that the adverse action occurred 15 months after Ms. Kasmir engaged in protected activity, and she speculated, "without any support," that she continued to be a target of Ms. Bernarding and Mr. Rice in "a string of events stemming from [Ms.] Kasmir originally raising her concerns."

The court additionally found that Ms. Kasmir failed to produce any evidence that RSSI's "proffered reasons for the demotion were pretexts for retaliation." It stated that the reasons given, that Ms. Kasmir "was offered a new position that resulted in a demotion due to [her] performance and the decision to restructure – are not inconsistent or raise an inference of deceit." Although Ms. Kasmir did not accept these reasons, her "self-assessment as to her skills is not sufficient to establish a material dispute of facts." The court found that Ms. Kasmir failed to establish that there were disputes of material fact regarding whether RSSI's proffered reasons for its actions were pretextual to permit submission of the retaliation claim to a jury.

This appeal followed.

**STANDARD OF REVIEW**

Pursuant to Maryland Rule 2-501(f) a circuit court shall grant summary judgment if there is "no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In reviewing a grant of summary judgment, we review the circuit court's determination "without deference." *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 487 Md. 385, 400 (2024).

We begin our analysis by "reviewing the record in the light most favorable to the nonmoving party and construing all reasonable inferences against the moving party." *Id.* We make "an independent determination" as to whether "a genuine dispute of material fact exists and whether the moving party is entitled to judgment as a matter of law." *Id.* A "material fact is 'a fact the resolution of which will somehow affect the outcome of the case.'" *Romeka v. RadAmerica II, LLC*, 485 Md. 307, 330 (2023) (quoting *USA Cartage Leasing, LLC v. Baer*, 202 Md. App. 138, 174 (2011)).

**DISCUSSION**

Ms. Kasmir contends that the circuit court erred in granting RSSI's motion for summary judgment as to Count II, retaliation in violation of MCC § 27-19(c). She argues that she established a prima facie case of retaliation by showing that she engaged in protected activity by making a complaint of discrimination, she was subject to multiple adverse actions that ultimately resulted in her demotion, and a reasonable jury could find that her protected conduct was a motivating factor in RSSI's imposition of adverse actions. She further asserts that, because she proffered a prima facie case, and RSSI produced legitimate non-retaliatory reasons for its adverse actions, the issue was whether these

18

reasons were a pretext for retaliation. She argues that there were disputes of material fact on that issue, and therefore, the court erred in granting summary judgment.

RSSI contends that the circuit court properly granted summary judgment in its favor on Ms. Kasmir's claim of retaliation for two reasons. First, it argues that Ms. Kasmir failed to establish a prima facie case of retaliation because there was no evidence of a causal connection between her discrimination complaint and the adverse event, i.e., her demotion. Second, RSSI contends that Ms. Kasmir failed to present evidence that RSSI's stated "non-discriminatory, business reasons" for changing Ms. Kasmir's position were a pretext for illegal discrimination based on retaliation. In that regard, it asserts that Ms. Kasmir's own opinion, without more, is not enough to disprove RSSI's non-retaliatory explanation.

Before addressing the specific claims of the parties, we address generally the law regarding discrimination and retaliation by employers. Both state and Montgomery County law prohibit an employer from improper discrimination against an employee. Md. Code Ann., State Gov't ("SG") § 20-1202(b) (2023 Supp.) provides that "a person that is subjected to a discriminatory act prohibited by . . . county code may bring and maintain a civil action against the person that committed the alleged discriminatory act for damages, injunctive relief, or other civil relief." MCC § 27-19(a)(1)(A) prohibits an employer from "discharg[ing] any individual, or otherwise discriminat[ing] against any individual with respect to compensation, terms, conditions, or privileges of employment" on the basis of a protected characteristic. This language is almost identical to the federal statute governing employment discrimination. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024) ("Title VII makes it unlawful for an employer 'to fail or refuse to hire or to discharge any

19

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'") (quoting Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)).[15]

In addition, both state and Montgomery County law make it unlawful for an employer to retaliate against an employee for complaining about discrimination. SG § 20-606(f); MCC § 27-19(c). As indicated, Ms. Kasmir relies on MCC § 27-19(c), which states, in relevant part, that:

(c) A person must not:

(1) retaliate against any person for:

(A) lawfully opposing any discriminatory practice prohibited under this division; or

(B) filing a complaint, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under this division.

A claim of retaliation may be shown by direct or circumstantial evidence. *See Taylor v. Giant of Md., LLC*, 423 Md. 628, 660 (2011). Direct evidence includes an admission by the employer that it took an adverse action against the employee in retaliation for the employee's protected activity. *Newberne v. Dep't of Crime Control & Pub. Safety*, 618 S.E.2d 201, 207 (N.C. 2005). *Accord Molesworth v. Brandon*, 341 Md. 621, 641

---

[15] In *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652 (2011), the Supreme Court of Maryland recognized Maryland's "history of consulting federal precedent" in employment discrimination cases. *Accord Lockheed Martin Corp. v. Balderrama*, 227 Md. App. 476, 507 n.14, *cert. denied*, 448 Md. 724 (2016).

(1996) (employer acknowledged that employee was fired, in part, because she was a woman). "Such 'smoking gun' evidence is rare, as 'few employers openly state that they are terminating employees [solely] because of'" protected activities. *Newberne*, 618 S.E.2d at 207 (cleaned up). *Accord Romeka*, 485 Md. at 326 ("Rarely do employers raise their hand and admit to making an adverse employment decision in retaliation for an employee's statutorily protected conduct.").

Here, Ms. Kasmir did not present any direct evidence of retaliation. Instead, she sought to establish retaliation by circumstantial evidence, utilizing the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lockheed Martin Corp. v. Balderrama*, 227 Md. App. 476, 504, *cert. denied*, 448 Md. 724 (2016); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 199-200, *cert. denied*, 434 Md. 313 (2013).

Pursuant to this framework, the employee claiming retaliation must first establish a prima facie case. *Romeka*, 485 Md. at 327; *Lockheed Martin*, 227 Md. App. at 504. To establish a prima facie case, a plaintiff must produce evidence that: (1) the plaintiff engaged in a protected activity; (2) the employer took an adverse action against the plaintiff; and (3) the employer's adverse action was causally connected to the protected activity. *Romeka*, 485 Md. at 327.

If the employee meets this burden and establishes a prima facie case of discrimination by retaliation, "the burden shifts to the employer to offer evidence of 'a non-retaliatory reason for the adverse employment action.'" *Belfiore v. Merch. Link, LLC*, 236 Md. App. 32, 52 (2018) (quoting *Edgewood*, 212 Md. App. at 200). If the employer

21

successfully rebuts the presumption of discrimination by setting forth non-discriminatory reasons for its actions, the employee must then show "that the proffered reasons for the employment action were a mere pretext." *Id.* (quoting *Edgewood*, 212 Md. App. at 200). "Establishing pretext," however, "is only the initial step of the remainder of the analysis," as the employee "retains the burden of proving that he was the victim of wrongful retaliation." *Id.*

## I.

## Prima Facie Case

As indicated, to establish a prima facie case, the plaintiff must produce evidence that: (1) the employee engaged in a protected activity; (2) the employer took an adverse action against the employee; and (3) the employer's adverse action was causally connected to the protected activity. *Lockheed Martin*, 227 Md. App. at 504. With respect to the requirement that the employee engaged in a protected activity, we note that "[a]n employee's complaint about an employer's allegedly discriminatory conduct," whether made formally or informally, "constitutes protected oppositional activity," as long as the employee shows "that he or she held a good faith, subjective, and objectively reasonable belief that the employer engaged in discriminatory conduct." *Id.* at 506 (quoting *Edgewood*, 212 Md. App. at 201-02).[16] If an employee brings to the employer's attention what the employee "perceives as discriminatory practices," the employee has engaged in a

---

[16] RSSI suggests that Ms. Kasmir's "abandonment of her age and discrimination claims, along with a multitude of undisputed facts, raise serious doubts about whether [Ms.] Kasmir 'reasonably believed' that [Mr.] Hill discriminated against her." It does not, however, raise this argument as a basis to affirm the circuit court's decision.

protected activity. *Id.* (quoting *Magee v. DanSources Tech. Servs., Inc.*, 137 Md. App. 527, 564 (2001)).

"Not every complaint about discrimination or unfairness, however, qualifies as protected activity." *Id.* at 507. Rather, the alleged discrimination must be "connected to a protected class." *Id.* *Accord Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("[T]he complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class. . . . Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."); *Md. Dep't of Health v. Best*, No. 1279, Sept. Term, 2023, 2024 WL 5244636, at *15-18 (Md. App. Dec. 30, 2024) (where the record did not show that the complaint was on the basis of race or another protected class, the complaint was not protected activity).

There is no dispute here that Ms. Kasmir engaged in protected activity in May 2019. She sent an email to Ms. Bernarding on May 15, 2019, complaining of age and gender discrimination, and she subsequently met with Ms. Bernarding on May 21, 2019, to discuss her complaint. There similarly is no dispute that she suffered an adverse action when RSSI demoted her from Director to Senior Manager in July 2020. The issue here is the third step, whether the adverse action was causally connected to Ms. Kasmir's protected activity.

At the causation stage of a retaliation case governed by the *McDonnell Douglas* framework, the employee "need not demonstrate but-for causation in her prima facie case; she needs to show only that the protected disclosure contributed in some way to the adverse employment action." *Romeka*, 485 Md. at 327. *Accord Belfiore*, 236 Md. App. at 52 (to

23

prove a causal connection, employee must present evidence that the employee's "opposition to unlawful harassing conduct played a *motivating* part in the employer's decision to terminate the employee's employment") (quoting *Ruffin Hotel Corp. of Md., Inc. v. Gasper*, 418 Md. 594, 612 (2011)).  In addressing this issue, the "most relevant" facts are "1) whether the person who decided to take the employment action knew, at that time, that the plaintiff had made a protected disclosure; and 2) whether there was a close temporal proximity between the disclosure and the adverse action."  *Romeka v. RadAmerica II, LLC*, 254 Md. App. 414, 456 (2022), *aff'd*, 485 Md. 320 (2023).

Ms. Kasmir contends that the circuit court erred in finding that "there was no causal nexus between" Ms. Kasmir's "protected activity and the subsequent adverse actions imposed by RSSI."  She relies primarily on temporal proximity, as well as her assertion that there were contradictions regarding who at RSSI knew about her protected activity. We will address each of those contentions, in turn.

### A.

### Temporal Proximity

RSSI contends that Ms. Kasmir's reliance on temporal proximity to establish causation fails.  It argues that there is no temporal proximity between Ms. Kasmir's May 2019 protected activity and the July 2020 adverse action because these events "are separated by 14 months."

Ms. Kasmir states that the "first retaliatory action, the Action Plan, came only one month after [her] protected activity."  She argues that, if we "correctly view[] the Action Plan, PIPs and poor performance review as adverse actions," the timeline between the

24

protected activity and the adverse action "becomes far less attenuated, and a clear pattern emerges."

As this Court noted in *Belfiore*, 236 Md. App. at 53-54, close proximity in time between protected activity and an adverse employment action may establish causation for purposes of a prima facie case. Courts have found that a time period of two weeks to one month is sufficient to establish prima facie temporal connection. *See Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 26 (1st Cir. 2004) (one month between protected activity and adverse action demonstrates sufficient temporal proximity); *Turner v. Hous. Auth.*, 188 F. Supp. 2d 1066, 1079 (S.D. Ill. 2002) (two weeks between protected activity and adverse action is "a short enough time" to establish the causal link).

At a certain point, however, "temporal proximity becomes too remote, without more, to permit an inference of causation." *Booth v. District of Columbia*, 701 F. Supp. 2d 73, 79 (D.D.C. 2010). Cases accepting mere temporal proximity as sufficient evidence of causality to establish a prima facie case "uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001)). Thus, a three-month gap "does not support a finding that there is a causal link, particularly in the absence of any concrete, nonspeculative evidence" that the decisionmaker knew about the protected activity. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021). *Accord Baroudi v. Sec'y, U.S. Dep't of Veterans Affs.*, 616 F. App'x 899, 902 (11th Cir. 2015) (delay of three to four months too long as a matter of law to establish causation by temporal

25

proximity); *DeBose v. USF Bd. of Trs.*, 811 F. App'x 547, 557 (11th Cir. 2020) (three to four month delay, standing alone, typically too large to show causation).

Indeed, a "lengthy" lapse of time, such as a year or more between the protected activity and the adverse action, "negates any inference that a causal connection exists between the two." *Roberts*, 998 F.3d at 126. *Accord Mitchell v. Young*, 309 So. 3d 280, 286 (Fla. Dist. Ct. App. 2020) (a year and a half too long to establish causation by temporal proximity). "[W]ere this not the case, an employee could guarantee his job security simply by filing a frivolous complaint with the EEOC on his first day of work." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

As indicated, RSSI contends that the timeline is based on protected activity in May 2019 and an adverse event in July 2020, when Ms. Kasmir was demoted. This results in a time period of 14 months. If we agree that this is the relevant time frame, it negates an inference of a causal connection between the protected activity and the adverse action.

Ms. Kasmir, however, contends that this is not the relevant time frame to address temporal proximity. She asserts that she engaged in additional protected activity after May 2019, and she suffered additional adverse actions before her ultimate demotion in July 2020, thereby shortening the temporal gap.

### i.

### Protected Activity

Ms. Kasmir contends that the starting date to measure temporal proximity begins at a later date than May 2019. She alleges that the following additional actions constituted protected activity: (1) Ms. Kasmir's July 16, 2019 email to Ms. Bernarding asking Ms.

26

Bernarding to elevate Ms. Kasmir's "discrimination concerns to the highest levels of management"; (2) Ms. Kasmir's July 30, 2019 "report of retaliatory animus" by Mr. Hill; and (3) Ms. Kasmir's October 4, 2019 email "reporting further retaliatory animus" by Mr. Hill.

RSSI disagrees. It contends that Ms. Kasmir's only protected activity occurred in May 2019, when Ms. Kasmir alleged age and gender discrimination by Mr. Hill. It argues that any additional activities are "subterfuge" designed to "close the temporal gap" between her protected activity and the adverse employment action.[17]

Assuming, *arguendo*, that each of these actions constituted protected activity, the temporal gap between the last date, October 2019, and Ms. Kasmir's demotion in July 2020 was nine months. We hold that a gap of nine months between protected activity and an adverse action is too long, by itself, to establish a prima facie case of causation based on temporal proximity.

### ii.

### Adverse Action

Ms. Kasmir argues, however, that even nine months is not the appropriate time frame to consider because the July 2020 demotion was not the only adverse action she suffered. She asserts that the following actions taken by RSSI also constituted adverse

---

[17] RSSI also contends that Ms. Kasmir's argument that actions after May 2019 constituted protected activity is not preserved for this Court's review because it was not raised below. We disagree. Our review of the record indicates that the argument was presented below in the pleadings and the hearing on the motion for summary judgment.

actions: (1) implementing an action plan for Ms. Kasmir in August 2019; (2) placing her on a PIP in January 2020; and (3) giving her a poor performance review in 2019.[18] Ms. Kasmir contends that these actions were adverse because they would dissuade a reasonable worker from pursuing or supporting a discrimination complaint.

RSSI argues that neither the action plan nor the PIP "rise to the level" of an adverse action. In support, it argues that the actions "had no detrimental or punitive impact on any aspect" of Ms. Kasmir's employment.

We begin by addressing what constitutes an adverse action in the context of an employment retaliation claim. "Although actions short of termination may constitute an adverse action, 'not everything that makes an employee unhappy is an actionable adverse action.'" *Lockheed Martin*, 227 Md. App. at 508 (quoting *Montandon v. Farmland Indus. Inc.*, 116 F.3d 355, 359 (8th Cir. 1997)). "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that

---

[18] No other information, or exact date, is given for the performance review in 2019. To the extent that this refers to the "meets expectations" evaluation given in April 2019 by Mr. Hill, that was *prior* to Ms. Kasmir's complaint in May 2019, and therefore, it cannot be the basis for a retaliation claim. *See Smith v. New York & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 344 (S.D.N.Y. 2020) ("The crux of any retaliation claim is a cause-and-effect relationship whereby protected activity precedes, and gives rise to, an adverse employment action. It is axiomatic that no such relationship can be found to exist where the alleged adverse employment action began and ended *prior* to the commencement of any protected activity.") (quoting *Dansler-Hill v. Rochester Inst. of Tech.*, 764 F. Supp. 2d 577, 582 (W.D.N.Y. 2011)). *Accord Md. Dep't of Health v. Best*, No. 1279, Sept. Term, 2023, 2024 WL 5244636, at *21 (Md. App. Dec. 30, 2024) (complaint of discrimination is not protected oppositional activity if the complaint was filed after the adverse action occurred). Accordingly, we address only the action plan and the PIP as they relate to the temporal proximity argument.

often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Rather, "to constitute 'actionable retaliation,' the challenged conduct must be 'materially adverse,' i.e., an action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lockheed Martin*, 227 Md. App. at 509 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68). The "material" or "significant" harm test is unique to the retaliation context. *Muldrow*, 601 U.S. at 357 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).[19] The test "was meant to capture those (and only those) employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68). It protects only against "retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 67-68. *Accord Israelitt v. Enter. Servs. LLC*, 78 F.4th 647, 655 (4th Cir. 2023) ("[R]etaliatory adverse actions must cause significant harm to be actionable."), *cert. denied*, 144 S. Ct. 1392 (2024); *Noonan v.*

---

[19] In *Best*, 2024 WL 5244636, at *25, we discussed the standard for what constitutes an adverse employment action "for a race-based discrimination claim under Title VII and Title 20 in Maryland." We explained that this standard is governed by the United States Supreme Court's holding in *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024). In *Muldrow*, the Court held that, in a discrimination claim, the plaintiff meets her burden of establishing that an adverse action occurred when she demonstrates a "disadvantageous" change in an employment term or condition. *Id.* at 354. *Muldrow* makes clear that this standard differs from the standard applied in retaliation claims. *Id.* at 357. In a retaliation claim, the employee meets her burden of establishing an adverse action if the employee demonstrates that the action "is 'materially adverse,' meaning that it causes 'significant' harm" to the employee. *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

*Consol. Shoe Co.*, 84 F.4th 566, 575 (4th Cir. 2023) (retaliatory conduct "must be 'materially adverse,' which means the plaintiff must show 'significant' harm").

In determining whether an action is adverse, context matters. As the United States Supreme Court has explained:

> "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale* [*v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)]. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. . . . A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69.

Here, Ms. Kasmir contends that RSSI took an adverse action against her when it implemented an action plan in August 2019. Ms. Kasmir alleges that this action exposed her to, and resulted in, "material consequences," including "direct economic harm" and loss of "promotional opportunities."

A review of the action plan shows that it listed goals, actions to be taken by both Ms. Kasmir and Mr. Hill to meet these goals, and "milestones" or dates for when actions needed to be completed. RSSI described the action plan as an attempt to align Ms. Kasmir's and Mr. Hill's communication and to track Ms. Kasmir's progress toward meeting the company's expectations. Ms. Kasmir stated that it "became [her] later understanding that the 'Action Plan' was to resolve communication and listening issues

30

and develop a working relationship between [Mr.] Hill and [herself], rather than being related to any performance issues."

Ms. Kasmir states in her brief on appeal that the action plan harmed her career potential, asserting that it was "highly unlikely (if not impossible) that any internal promotional opportunities would be available to employees" on such a plan. She presented no evidence, however, in that regard. Without such evidence, we cannot conclude that placing Ms. Kasmir on the action plan was an adverse action. *See Hudson v. Lincare, Inc.*, 58 F.4th 222, 231-32 (5th Cir. 2023) (where there was no evidence the action plan "objectively worsen[ed] the employee's working conditions," it was not an adverse action); *Bishop v. Bell Atl. Corp.*, 299 F.3d 53, 59 (1st Cir. 2002) (putting employee on an action plan was not an adverse employment action).

Similarly, placing an employee on a PIP, "without any other material consequences, does not constitute an adverse action." *Lockheed Martin*, 227 Md. App. at 510. As this Court has explained, placing an employee on a PIP "can constitute an adverse employment action where it exposes the individual to direct economic harm such as loss of salary, benefits, position, or promotional opportunities." *Id.* (quoting *Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 71 (D.D.C. 2012)). If, as is the case here, the employee presents "no evidence that he suffered any change . . . as a result of being placed on the PIP[,]" there is no adverse action. *Id.* at 511. *Accord Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (employer's requirement that an employee comply with an improvement plan does not constitute an adverse action).

31

Ms. Kasmir argues, however, that when she was placed on the PIP in January 2020, Mr. Hill "explained that she was going to be terminated in two months' time, regardless of her performance on the PIP."[20] She argues that "[a]ssured termination plainly exposes [her] to direct economic harm of loss of salary, benefits, position, and promotional opportunities in combination with the PIP."

The record, however, refutes her assertion that her placement on the PIP, even with Mr. Hill's threat of termination, created any negative consequence that would constitute an adverse action. As this Court has explained, a "suggestion" without action does not constitute an adverse action, *Lockheed Martin*, 227 Md. App. at 510, and Ms. Kasmir was not fired.[21] Moreover, Ms. Bernarding negated Mr. Hill's suggestion of termination a couple of weeks later when she advised Ms. Kasmir that she "would not be terminated because of the PIP." Consequently, RSSI's action in placing Ms. Kasmir on a PIP was not an adverse employment action. *See Lockheed Martin*, 227 Md. App. at 510.

Accordingly, we agree with RSSI and the circuit court that the adverse action here occurred in July 2020, when Ms. Kasmir was demoted.[22] Thus, the temporal proximity between Ms. Kasmir's protected activity and the adverse activity was, at a minimum, nine

---

[20] Ms. Kasmir's original affidavits allege that she was "verbally told she would be terminated in two months' time and was put on a Performance Improvement Plan (PIP)."

[21] In fact, Ms. Kasmir received a 1% salary increase in June 2020.

[22] We also note that, although not dispositive, Ms. Kasmir listed the date of harm in her complaint to OCR as July 24, 2020.

months, a gap of time that, by itself, is too long to establish causation for a prima facie case.[23]

## B.

### Proximity Plus

Ms. Kasmir argues that, even if we consider her demotion as "the sole adverse action" and determine that she failed to show causation based on temporal proximity, she established her prima facie case "under the proximity plus analysis," which allows a plaintiff to establish causation "by demonstrating that the employer's retaliatory conduct began shortly after her complaint, even though actual adverse action came much later." She notes that the action plan, which was implemented in August 2019, occurred only four days after she asked for her complaint to be raised to the highest levels of management.

RSSI contends that the proximity plus argument is not preserved for review because it was not raised in the circuit court. Moreover, it asserts that, "to the extent the 'proximity plus' theory of causation even applies in Maryland, it does not save [Ms.] Kasmir's retaliation claim" because the record presents "no evidence of temporal proximity or proximity 'plus' something more."

Maryland Rule 8-131(a) provides that, generally, "an appellate court will not decide" an issue unless the issue "plainly appears by the record to have been raised in or decided by the trial court." Although Ms. Kasmir's argument below did not use the phrase

---

[23] We note that, even when temporal proximity is very close, the inference of causation is weakened when, as here, there were performance issues around the same time as the complaints. *Hudson v. Lincare, Inc.*, 58 F.4th 222, 232 (5th Cir. 2023).

"proximity plus," she did argue, in support of showing causation, that "key events in the timeline" included: (1) July 16, 2019, when she "emailed human resources asking that they elevate her already filed discrimination complaint to higher levels of management"; (2) July 26, 2019, when she and Mr. Hill met for a mid-year check-in where Mr. Hill "instruct[ed] her to meet impossible deadlines and refus[ed] to provide [her] with the resources that she need[ed]"; (3) July 30, 2019, when she "once again reported retaliatory conduct by Mr. Hill to human resources"; and (4) August 2019, when she was put on the action plan. She argued that, based on "how close in time each of those events occurred," "a reasonable jury could come to the conclusion that [RSSI] was motivated by the complaints that [she] continued to make and had a retaliatory animus toward her." The contention is adequately preserved for review.

Ms. Kasmir relies on *Elries v. Denny's Inc.*, 179 F. Supp. 2d 590, 599 (D. Md. 2002), where the court stated that, in the circumstance where a lapse of time is too long to establish temporal proximity, "the plaintiff's burden becomes 'proximity plus': a plaintiff shows retaliatory conduct that began shortly after filing a complaint, thus showing prima facie causation, even though actual termination came much later." *Accord Barbour v. Garland*, 105 F.4th 579, 593 (4th Cir. 2024) (where the employee cannot solely rely on evidence of temporal proximity as proof of causation, "courts may look to the intervening period for other evidence of retaliatory animus"). Retaliatory animus during a long temporal gap can be demonstrated by "evidence that the employer took 'steps [that] made it easier . . . to take the position later that [the adverse action was justified].'" *Barbour*,

34

105 F.4th at 594 (alterations in original) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 651 (4th Cir. 2007)).

Here, Ms. Kasmir did not show, as in *Elries*, 179 F. Supp. 2d at 599, a "throng of written reprimands that began shortly after [her] initial complaints of discrimination." Instead, she relies on an action plan, which she acknowledged was intended to improve her communication with her supervisor, and a PIP. Ms. Kasmir, however, presented no evidence that Mr. Haubenstricker, the person who made the decision to demote her, was involved with these actions or even knew about her protected activity. Ms. Kasmir failed to support an inference of causation between her protected activity and her demotion under a "proximity plus analysis."

## C.

### Decisionmaker's Knowledge

Knowledge of the decisionmaker regarding the protected activity is very important, and some courts say critical, to show causation for retaliation. Retaliation is an intentional act, and therefore, a "supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place." *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915-16 (7th Cir. 2022). *Accord Stratton v. Bentley Univ.*, 113 F.4th 25, 45 (1st Cir. 2024) ("Without evidence of a decisionmaker's knowledge of the protected conduct, the adverse action could not have been caused by a desire to retaliate against the plaintiff.") (cleaned up).

Moreover, the decisionmaker's connection to the protected activity can strengthen or weaken an inference of causation. Where "a decisionmaker both knows about *and* was

involved in," or was the target of, a prior complaint, the inference of causation is strengthened. *Ho v. Garland*, 106 F.4th 47, 53 (4th Cir. 2024). Conversely, if "a decisionmaker merely knows about protected activity—but is not involved in or targeted by the prior complaint—that fact weakens an inference that the decisionmaker might have retaliatory animus." *Id.*

Ms. Kasmir recognizes the relevance of showing that the person who decided to take the adverse action knew about the protected activity. Her argument in this regard, however, is brief. She states that the "alleged decisionmaker, [Mr.] Haubenstricker, testified that he relied on [Mr.] Rice and [Ms.] Bernarding's 'feedback' when he decided to present [Ms. Kasmir] with demotion or termination," and both of these individuals were aware of Ms. Kasmir's protected activity. She contends that Mr. Hill was aware of her protected activity, and states, without explanation, that this knowledge "is key to [Ms.] Kasmir's retaliation claim."

RSSI contends that it "is undisputed that the Total Wine decisionmakers who chose to change [Ms.] Kasmir's position, [Mr.] Brendle (who raised and recommended the idea) and CFO Haubenstricker (who together with [Mr.] Rice approved the recommendation), had no knowledge of Kasmir's discrimination complaint." Thus, it asserts that the circuit court properly found that Ms. Kasmir failed to make a prima facie showing of causation.

The record reflects that Mr. Brendle recommended the change to Ms. Kasmir's position, but the decisionmaker was Mr. Haubenstricker, who made the decision with Mr.

Rice's approval. There was no evidence that Mr. Brendle, Mr. Haubenstricker, or Mr. Rice were aware of Ms. Kasmir's complaint of discrimination against Mr. Hill.[24]

Ms. Kasmir attempts to impute knowledge to Mr. Haubenstricker, stating that he relied on feedback from Ms. Bernarding, who was aware of Ms. Kasmir's protected activity. There was no evidence, however, that Ms. Bernarding told Mr. Haubenstricker about Ms. Kasmir's protected activity. *See Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512-13 (7th Cir. 2021) (for a retaliation claim to reach the jury, "the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity," and it is "not sufficient that a decision-maker could have or even should have known about the employee's complaint"). Moreover, Ms. Bernarding was not the subject of Ms. Kasmir's complaints, and there was no evidence that she had any animus against Ms. Kasmir. Ms. Kasmir failed to show that the decisionmaker, Mr. Haubenstricker, had knowledge of the protected activity.

The circuit court properly found that Ms. Kasmir failed to make a prima facie case of retaliation because she failed to show a causal connection between her protected activity and her demotion. The court properly granted summary judgment for RSSI on that ground.

---

[24] Mr. Haubenstricker testified at his deposition that he had no knowledge that Ms. Kasmir had made complaints about discrimination at the time the decision was made to change Ms. Kasmir's position. Rather, he explained that "it was made very clear" that, "for a period of time," and through different leaders, Ms. Kasmir was struggling in her performance. Mr. Brendle stated that he heard there had been "issues" with Ms. Kasmir "in the past," but he "really wasn't that knowledgeable" about the issues. The record did not address Mr. Rice's knowledge. Ms. Kasmir states in her brief and reply brief that Mr. Rice was aware of her protected activity, citing to her affidavit, but we did not see support for that statement there or anywhere else in the record.

Although the circuit court could have ended its analysis at that point, it nevertheless proceeded to discuss the next two steps in the analysis. We shall do that as well.

## II.

## Non-Retaliatory Reason

Even assuming, *arguendo*, that Ms. Kasmir met her prima facie burden, the burden would then shift to RSSI to articulate a legitimate, non-discriminatory reason for Ms. Kasmir's demotion. *McDonnell Douglas*, 411 U.S. at 802; *Candolfi v. Allterra Grp., LLC*, 254 Md. App. 221, 240 (2022). RSSI produced undisputed evidence that Ms. Kasmir's supervisors thought that she was doing a poor job managing the growing number of stores, and therefore, a restructuring of her position was required. "Failure to perform job tasks is a classic example of a legitimate reason to fire [or demote] an employee." *Hudson*, 58 F.4th at 232.

## III.

## Pretext/Proof of Retaliation

Because RSSI produced legitimate, non-retaliatory reasons for Ms. Kasmir's demotion, Ms. Kasmir bore the burden to "demonstrate that the nondiscriminatory reason offered [by the employer] was not the true reason [for the adverse action], but rather, it was a pretext for illegal discrimination based on retaliation." *Lockheed Martin*, 227 Md. App. at 512. *Accord Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 176 (4th Cir. 2023).

Ms. Kasmir contends that "a myriad of genuine and material fact disputes exist" on the issue whether RSSI's proffered reasons for the demotion were pretexts for retaliation, and the circuit court impermissibly made credibility determinations in its findings. In

38

support, Ms. Kasmir argues that RSSI's reasons for its decision to demote her were inconsistent and not believable.

RSSI contends that the circuit court properly found that Ms. Kasmir had failed to establish any disputes of material fact that would permit a jury to find that RSSI's proffered reasons for its actions were pretextual. It asserts that Ms. Kasmir "misapplied" the legal standards employed at the pretext stage of the *McDonnell Douglas* framework, and that this mistake is "fatal to her case." It contends that Ms. Kasmir failed to "prove with evidence (rather than her opinion) that Total Wine lied about its nonretaliatory justifications."

To succeed at step three of the *McDonnell Douglas* framework, the employee must show that the adverse action would not have been taken in the absence of her protected activity. *Romeka*, 485 Md. at 328. The employee "must present substantial evidence to support a reasonable probability, rather than a mere possibility, that her employer discriminated against her." *Candolfi*, 254 Md. App. at 241 (quoting *Nerenberg v. RICA of S. Md.*, 131 Md. App. 646, 674 (2000)). As this Court explained in *Lockheed Martin*, 227 Md. App. at 512, the plaintiff must

> demonstrate that the nondiscriminatory reason offered [by the employer] was not the true reason [for the adverse action], but rather, it was a pretext for illegal discrimination based on retaliation. "[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In *Edgewood*, 212 Md. App. at 200, we explained that an employee could establish pretext by demonstrating weaknesses, inconsistencies, or contradictions in the employer's

39

proffered reasons for the action taken. The employee, however, had to highlight enough inconsistencies such that a reasonable factfinder could rationally find the employer's reasons unbelievable, allowing the factfinder to draw an inference that the employer was lying about the reasons for its actions. *Id.*

Ms. Kasmir makes several allegations in support of her argument that RSSI's explanation for her demotion was inconsistent or unbelievable. First, she argues that "RSSI provided inconsistent answers regarding to what extent performance concerns and an alleged restructuring contributed to its adverse actions against [Ms.] Kasmir." She asserts that "RSSI initially explained the demotion as purely performance-related," and it then reframed its actions as a restructuring. As she notes, however, it is "not impossible for both restructuring and performance concerns to contribute equally to an employment action." That is what the record shows happened here. Mr. Brendle testified that he had numerous concerns with Ms. Kasmir's performance, especially her failure to complete tasks, and that RSSI's solution to Ms. Kasmir's performance problems was to restructure her role within the company. Mr. Haubenstricker also testified that "the most significant factor" in RSSI's decision to restructure Ms. Kasmir's role was Ms. Kasmir's poor performance in her role as it existed at that time. Ms. Kasmir offered no evidence, other than speculation, that this testimony was false.

Second, Ms. Kasmir contends that "there is a dispute of fact as to whether *anyone* besides [Ms.] Kasmir was negatively impacted by the restructuring." Mr. Haubenstricker testified that "[a] number of people's roles changed" in the restructuring. Although Ms. Kasmir stated in her brief that she "testified to being the sole employee at RSSI whose role

40

was impacted by the apparent restructuring," she did not provide a citation to the record for this assertion, and we could not find that testimony in the record provided on appeal. In any event, even if there was a dispute of fact on this issue, it was not one of material fact where Ms. Kasmir's job performance and inability to effectively do her job were the reasons for dividing her job into two positions and demoting her.

Third, with respect to RSSI's evidence that her performance warranted demotion, Ms. Kasmir argues that this claim is "so inconsistent and implausible as to indicate pretext for retaliation." In support of her argument, she points to her own opinion of her performance. An employee's "perception of himself, however, is not relevant" to the pretext inquiry. *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980). "It is the perception of the decision maker which is relevant." *Id.* *Accord Candolfi*, 254 Md. App. at 241-42 ("[A] disgruntled employee's self-serving statements about [her] qualifications and abilities generally are insufficient to raise a question of fact about an employer's honest assessment of that ability.") (quoting *Williams v. Md. Dep't of Hum. Res.*, 136 Md. App. 153, 174 (2000)); *Nagpal v. Holder*, 750 F. Supp. 2d 20, 26 (D.D.C. 2010) (an employee's "subjective views of his performance do not adequately rebut the inference that his supervisors honestly believed that his performance was deficient").

Here, there were concerns with Ms. Kasmir's performance prior to her complaint against Mr. Hill. Moreover, it is undisputed that the decisionmaker, Mr. Haubenstricker, had perceived "for some time" that Ms. Kasmir "was struggling from a performance standpoint with meeting the requirements of the job." Ms. Kasmir's subjective views about

41

her performance are inadequate to establish that RSSI's reason for demoting her was pretextual.[25]

Fourth, Ms. Kasmir contends that she showed pretext based on RSSI's action in giving her "impossible, unattainable, or conflicting goals," which was an effort to set her up for failure. In support of this proposition, she cites *Willnerd v. First Nat. Neb., Inc.*, 558 F.3d 770, 779 (8th Cir. 2009). To be sure, the court in that case stated, in the context of a discrimination complaint under the Americans with Disabilities Act, that it is "permissible for a jury to view the imposition of an unattainable goal as evidence of pretext because a jury may reasonably view the goal or production quota as an effort to set up an employee for failure." *Id.* at 779. In that case, however, there was evidence, apart from the employee's personal opinion, that generated a triable question of fact whether the quota was unattainable. *Id.* at 779-80. *Accord Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 499 (8th Cir. 1998) (goals were shown to be "unattainable as measured by the accomplishments of other employees"), *cert. denied*, 526 U.S. 1115 (1999).

Regardless, Ms. Kasmir cites no evidence, other than her personal opinion, that RSSI's goals were impossible or unattainable. Her subjective opinion that RSSI's goals were impossible does not support a finding of pretext. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 580 (7th Cir. 2015) (employee's "subjective belief that her targets should

---

[25] Ms. Kasmir argues that there were inconsistencies regarding the use of the action plan, with assertions that the plan was instituted because of Ms. Kasmir's poor performance *and* to facilitate better communication between Mr. Hill and Ms. Kasmir. The record reflects, however, that those two statements were not inconsistent, but rather, they were complementary goals of the action plan.

42

have been prorated more than they were does not undermine the honesty of [employer's] stated explanation for terminating her and thus could not support a finding of pretext"). Moreover, as RSSI notes, to the extent that Mr. Hill set impossible goals for Ms. Kasmir in 2019, there was no evidence that those goals impacted Mr. Brendle's recommendation to bifurcate her role almost a year later, after observing her performance.

Fifth, Ms. Kasmir contends that "[a]nother form of pretext evidence that precludes summary judgment in this case is when the employer's adverse actions are justified by subjective criteria." An employer is not prohibited from considering subjective criteria in making employment decisions. *Clark v. Olin Winchester, LLC*, 724 F. Supp. 3d 738, 748 (S.D. Ill. 2024). "[U]nless the subjective criteria was a mask for discrimination or retaliation, the fact that the . . . decision was based solely on subjective criteria will rarely, if ever, prove pretext." *Id.*

Here, the record indicates that RSSI's decision to demote Ms. Kasmir was not based solely on subjective criteria. The reviews regarding Ms. Kasmir's performance contained objective standards by which she was measured, and the record indicates that she failed to meet those standards of performance.

Ms. Kasmir's sixth and final argument is that "one more form of pretext evidence that precludes summary judgment is the employer conducting a biased or unfair investigation, especially when such an investigation culminates in an adverse action." She suggests that, although RSSI "had rules on investigating and correcting any instance of retaliation," it "never looked into [her] allegations, instead looking into [her] performance."

43

"A 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1314 (10th Cir. 2017) (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014)). "But an employer may ordinarily 'defeat the inference' of pretext stemming from an allegedly unfair investigation by 'simply asking an employee for his version of events.'" *Id.* (quoting *E.E.O.C. v. BCI Coca–Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006)).

Here, there was no evidence, other than Ms. Kasmir's opinion, that RSSI failed to conduct a fair investigation of Ms. Kasmir's complaints. Ms. Bernarding spoke with multiple individuals, including Ms. Kasmir, about Ms. Kasmir's concerns. Ms. Bernarding testified that there were "different iterations" of her investigation into Ms. Kasmir's complaints, but she determined "there was not discrimination against [Ms. Kasmir] in any of the iterations of the concerns that she expressed."

In sum, Ms. Kasmir's pretext allegations fail because she did not provide sufficient evidence to create a triable issue of fact that RSSI's statements were false and that retaliation was the real reason Ms. Kasmir was demoted. Accordingly, the circuit court did not err in awarding summary judgment to RSSI.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

44